## Commonwealth vs. David N. Tavares.

Bristol. October 6, 1981. — January 29, 1982.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, & Nolan, JJ.

*Homicide. Constitutional Law*, Admissions and confessions, Waiver of
constitutional rights. *Waiver. Practice, Criminal*, Capital case, In-
structions to jury, Voluntariness of confession, Deliberation of jury.
*Evidence*, Admissions and confessions, Relating to deliberation by
jurors. *Jury and Jurors. Pleading, Criminal*, Bill of particulars.

On a motion to suppress statements made to police by a seventeen year old
criminal defendant, the judge correctly concluded, in the totality of
the circumstances, that the defendant had knowingly and voluntarily
waived his Miranda rights and had made the statements voluntarily.
[142-146]

At a criminal trial no error appeared in the judge's use of the expression
"moral certainty" in instructing the jury on proof beyond a reasonable
doubt [146-147]; nor did his unobjected-to use of language from the
charge in *Commonwealth* v. *Madeiros*, 255 Mass. 304, 307 (1926), ex-
pressing concern for the public safety, create, in the circumstances, a
substantial likelihood of a miscarriage of justice [147-149].

In a criminal trial where voluntariness of the defendant's statements to
police was never made an issue and where the defendant requested no
instructions on the issue of voluntariness, no substantial risk of a mis-
carriage of justice resulted when the judge, without objection by coun-
sel, instructed the jury in terms of a "presumption" that a confession by
an accused is voluntary. [149-151]

Discussion of the duties of a trial judge under the Massachusetts "humane
practice" respecting the admission in evidence and the consideration
by the jury of statements by an accused person. [151-153]

Where the judge at a criminal trial received a report of certain remarks,
including some reflecting racial prejudice, made by two of the jurors
and, after interviewing the jurors to determine the possible effects of
the remarks, found that the jury could fairly and impartially reach a
verdict, his conclusions were, in the circumstances, not clearly errone-
ous and would not be disturbed on appeal. [153-157]

Where material furnished by the Commonwealth to a defendant prior to
his trial on a charge of murder was adequate to place him on notice
that evidence of extreme atrocity or cruelty might be introduced, there

was no merit to his claim that he was prejudicially surprised by such evidence. [157]

On review of a conviction of first degree murder this court concluded, pursuant to its obligation under G. L. c. 278, § 33E, that the evidence was more consistent with a verdict of murder in the second degree and reduced the verdict accordingly. [157-159]

INDICTMENT found and returned in the Superior Court Department on May 29, 1979.

The case was tried before *Taveira, J.*

*Willie J. Davis* (*Mary D. Gearin* with him) for the defendant.

*Lance J. Garth*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. After a jury trial, the defendant, David Tavares, was convicted of murder in the first degree.[1] He was sentenced to the mandatory term of life imprisonment.[2] Tavares appeals. He claims error concerning (1) the denial of his motion to suppress statements made by him to police officials; (2) the instructions to the jury; (3) the denial of a motion for mistrial based on juror misconduct;[3] and (4) a variance between the Commonwealth's proof and its bill of particulars. Tavares also requests that we exercise our power under G. L. c. 278, § 33E, and reduce the verdict

---

[1] The defendant was also convicted of larceny from a person, but the indictment was placed on file with the defendant's consent. Thus, there is no issue before us as to the propriety of this conviction. "Absent exceptional circumstances, we do not consider appeals on assignment of error on indictments placed on file [with the defendant's consent] since no appeal may come before us until after judgment, which in criminal cases is the sentence." *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

[2] Two other men, Keith Tavares, the defendant's cousin, and a friend, Bruce Bookman, also were tried and convicted as a result of the victim's death. Since each man made statements to the police, there were three separate trials. See *Bruton* v. *United States*, 391 U.S. 123 (1968). Keith Tavares was convicted of murder in the second degree; Bookman was convicted of manslaughter.

[3] Tavares also appeals from the denial of a motion for a new trial based on a claim of juror misconduct. The appeal from the denial of the motion for a new trial was consolidated with Tavares's direct appeal.

to a lesser degree of guilt. We conclude that there was no reversible error. However, our review under § 33E indicates that "the verdict of conviction of murder in the [first] degree was against the weight of the evidence considered in a large or nontechnical sense . . . ," *Commonwealth* v. *Bowman*, 373 Mass. 760, 765 (1977), and we order a reduction of the verdict to murder in the second degree.

We summarize the facts. On the evening of May 24, 1979, the defendant, age seventeen, was drinking in the third base dugout of Dias Field in New Bedford. He was accompanied by a friend, Bruce Bookman, age seventeen, and a cousin, Keith Tavares (Keith), age twenty. While in the dugout, the three collectively consumed twelve twelve-ounce cans of beer and a fifth of vodka. They decided to obtain more beer, but were fifty cents short of the purchase price. One of them approached the victim, Jesse Aranjo, as he was passing by the dugout, and asked him for fifty cents. The victim was not known to any of the three men in the dugout.

The victim responded by insulting them. He threatened to return with members of his motorcycle gang to beat them up. A fight ensued between the three men and the victim. The victim was subdued, and the defendant, aided by Keith and Bookman, removed the victim's clothing and took him into the dugout where they left him. The defendant, Keith, and Bookman then left the ballpark, the defendant taking the victim's jacket, which he later discarded, and one dollar, which he later lost. The defendant returned to the ballpark shortly thereafter to retrieve a comb he had lost during the fight and saw the victim in the dugout, trying to get up.

1. *The motion to suppress.* The body of Jesse Aranjo was discovered at approximately 12:30 P.M. on May 25, 1979. At approximately 2 A.M. on May 26th, the defendant and a female companion went to the police station and asked the officer in charge if the police were looking for him. The officer replied that his records did not indicate that the police were looking for a David Tavares. The officer recommended that Tavares call back later in the day.

At about 10:30 A.M., the police went to Tavares's house and asked him if he would voluntarily come to the station to speak with them. Tavares agreed to go to the station. At that time, Tavares knew of Aranjo's death. He also knew that the police wanted to speak to him about Aranjo. At the station, Tavares made some incriminating statements.[4]

Prior to trial, the defendant moved to suppress those statements. The defendant claims that as a result of his youth and inexperience, he made these statements without a knowing and intelligent waiver of his Miranda rights as required by the Fifth and Sixth Amendments to the Constitution of the United States. At the hearing on his motion, the defendant did not deny that he made the statements, nor did he claim that the police used force, intimidation, or trickery to obtain the statements. He also did not allege that the police denied him food, drink, or sleep or that the police used physical brutality. Further, he did not claim that the police failed to advise him of his constitutional rights. The basis for Tavares's motion was that the statements were coerced because of his lack of experience and his youthful fear of authority.

After the suppression hearing, the judge made the following findings of fact. At the police station, the defendant was repeatedly advised of the Miranda rights. The defendant indicated to police that he understood these warnings. Before making any statements, the defendant signed a card acknowledging that he understood his rights. Moreover, the judge found that, since the defendant had been arrested on prior occasions, he was familiar with these procedures.

From listening to a tape recording of the interrogation, the judge found no evidence of any threats, inducements, or

---

[4] Essentially, Tavares admitted to the police that he fought with Aranjo on May 25, 1979. However, he denied killing Aranjo. Tavares claimed that, when he, Keith, and Bookman left Aranjo in the third base dugout, Aranjo was very much alive and that others had the opportunity to kill Aranjo. Tavares denied kicking Aranjo in the head and chest, where the blows were most savage. The Commonwealth experts were able to identify tread marks, similar to shoes worn by Keith, on the victim's body, while the defendant's shoes had no blood on them.

promises of reward. The tapes indicated that the defendant was coherent and appeared to understand what was said during the interrogations. The judge concluded that Tavares knowingly and voluntarily waived his constitutional rights. The judge also concluded that after the waiver the defendant intelligently and voluntarily answered the questions put to him by the police.

The defendant challenges the judge's findings as erroneous. He claims that his youth and inexperience vitiated his waiver,[5] and that his statements were not voluntary. To support his argument, the defendant cites several studies that have suggested that youths are particularly susceptible to the inherent coerciveness of interrogations.[6] See Gage, Protecting the Juvenile Witness, 17 J. of Family L. 439, 451 (1978); Note, Interrogations in New Haven, The Impact of Miranda, 76 Yale L.J. 1519, 1577 (1967). Relying on these studies, the defendant claims that because of his special sensitivity to police pressure in his first statement to the police, he took more than his share of responsibility for the fight with Aranjo.[7]

"In reviewing a trial judge's determination that a voluntary waiver was made, the judge's subsidiary findings will

---

[5] We need not address ourselves to whether the Commonwealth must establish that the defendant waived his constitutional rights by a "preponderance of the evidence," see *Lego* v. *Twomey*, 404 U.S. 477, 489 (1972), or by proof beyond a reasonable doubt, since the defendant did not raise this issue at trial or on appeal. In any event, the judge's conclusion that the waiver was a knowing and voluntary one appears "from the record with unmistakable clarity." *Commonwealth* v. *Harris*, 371 Mass. 462, 472 n.4 (1976), quoting *Eisen* v. *Picard*, 452 F.2d 860, 863 (1st Cir. 1971).

[6] It does not appear that the defendant brought these studies to the attention of the trial judge.

[7] The police interviewed the defendant three times: the first interview was between 10:56 A.M. and 11:41 A.M.; the second interview, between 11:41 A.M. and 12:05 P.M.; and the third, between 1:37 P.M. and 1:55 P.M. The second and third interviews were taped, the first interview was not taped. In his first two interviews, the defendant told the police that only he (and not Keith or Bookman) had fought with Aranjo. According to the record, after he talked with his family, the defendant implicated Keith.

not be disturbed, if they are warranted by the evidence, and his resolution of conflicting testimony will be accepted." *Commonwealth* v. *Santo,* 375 Mass. 299, 303 (1978). See *Commonwealth* v. *Tabor,* 376 Mass. 811, 822 (1978); *Commonwealth* v. *Murphy,* 362 Mass. 542, 550 (1972) (Hennessey, J., concurring). Although the judge's ultimate findings are open for review, "a finding of voluntary waiver is 'entitled to substantial deference by this court.' *Commonwealth* v. *White,* 374 Mass. 132, 138 (1977), aff'd, 439 U.S. 280 (1978)." *Commonwealth* v. *Tabor, supra.* However, "[o]ur appellate function requires that we make our independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found . . . .' *Brewer* v. *Williams,* 430 U.S. 387, 403 (1977)." *Commonwealth* v. *Haas,* 373 Mass. 545, 550 (1977). See *Commonwealth* v. *Wilborne,* 382 Mass. 241, 251 (1981).

A judge's finding that the defendant knowingly and voluntarily waived his Miranda rights is not the only prerequisite to admissibility. A judicial determination of voluntariness is also constitutionally required. *Jackson* v. *Denno,* 378 U.S. 368 (1964). "In determining admissibility in the first instance the judge is undoubtedly bound by the dictates of *Miranda,* i.e., if its prerequisites have not been fully met, the confession is without more involuntary as a matter of law, hence inadmissible and insubmissible. But an incriminating statement may also be inadmissible and insubmissible because not factually shown to have been freely and voluntarily given, even though the requirements of *Miranda* have been fully met." *Coyote* v. *United States,* 380 F.2d 305, 309-310 (10th Cir.), cert. denied, 389 U.S. 992 (1967). See *Eisen* v. *Picard,* 452 F.2d 860, 863-865 (1st Cir. 1971).

At the suppression hearing, the defendant offered no evidence that he was particularly susceptible to police pressure. There was no evidence that he had been drinking in the hours immediately before he spoke to the police. Nor was there any evidence of mental impairment or the use of drugs. See *Commonwealth* v. *Wilborne,* 382 Mass. 241, 253-254 (1981). Compare *Commonwealth* v. *Hosey,* 368

Mass. 571 (1975); *Commonwealth* v. *Daniels*, 366 Mass. 601 (1975). Indeed, the record indicates that he had completed the tenth grade, had been accepted into the armed forces of the United States, and was married and the father of a child.

The record offers no explanation why the defendant first said that he alone kicked the victim. However, there may be explanations for the defendant's conduct other than the susceptibility of youth. For example, the defendant may have been acting under a code of silence, with a foolish sense of braggadocio or from family loyalty to his cousin Keith. In any event, we are not free to speculate on matters outside the record. Cf. *Commonwealth* v. *Ferguson*, 384 Mass. 13, 17-19 (1981).

"A minor may waive constitutional rights and make a confession which is admissible against him." *Commonwealth* v. *Daniels*, 366 Mass. 601, 605 (1975), and cases cited. Compare *Commonwealth* v. *Davis*, 380 Mass. 1, 4-7 (1980); *Commonwealth* v. *Daniels, supra* at 606-608, with *Commonwealth* v. *Meehan*, 377 Mass. 552, 567-568 (1979), cert. dismissed, 445 U.S. 39 (1980). Whether the facts support the admission of statements made by a minor "must be determined by an examination of 'the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation.' *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973)." *Commonwealth* v. *Daniels*, 366 Mass. 601, 606 (1975). In light of the totality of the circumstances, we believe that the judge correctly concluded that the defendant knowingly and voluntarily waived his rights under *Miranda* and made the statements voluntarily.

2. *Jury instructions.* The defendant claims three errors in the instructions to the jury: (1) the judge erred in using the term "moral certainty" in defining reasonable doubt; (2) the judge impermissibly shifted the burden of proof from the Commonwealth by using language from *Commonwealth* v. *Madeiros*, 255 Mass. 304, 307 (1926); and (3) the instructions on admissions were prejudicially erroneous. We disagree.

a. *Moral certainty*. The defendant claims error in the failure of the judge to grant one of his requests for instructions to the jury. Relying on *United States* v. *Indorato*, 628 F.2d 711, 720 (1st Cir.), cert. denied, 449 U.S. 1016 (1980), the defendant argues that the judge erred when he equated the requirement of proof beyond a reasonable doubt with proof to a moral certainty.[8] The defendant's argument is most unpersuasive, because the defendant requested instructions containing the words "moral certainty."[9] Further, instructions containing the words "moral certainty" have not resulted in reversals. See *United States* v. *Previte*, 648 F.2d 73, 83 (1st Cir. 1981); *United States* v. *Indorato, supra* at 721; *United States* v. *Magnano*, 543 F.2d 431, 436-437 (2d Cir. 1976). Moreover, we believe it is sound policy to adhere to the definition of reasonable doubt set forth in *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), a definition that includes the words "moral certainty." See *Commonwealth* v. *Williams*, 378 Mass. 217, 235 (1979); *Commonwealth* v. *Ferreira*, 373 Mass. 116, 130 n.12 (1977).

b. *Madeiros charge*. The defendant also claims that the judge erred when he instructed the jury with language from the instructions quoted in *Commonwealth* v. *Madeiros*, 255 Mass. 304, 307 (1926).[10] Trial counsel[11] did not specifically

---

[8] The relevant portion of the charge reads: "A fact is proved beyond a reasonable doubt when it is proved to a moral certainty as distinguished from an absolute certainty or a mathematical certainty, when it is proved to a degree of certainty that satisfies the judgments and consciences of the jury as reasonable men and women and leaves in their mind a settled conclusion of guilt."

[9] The defendant's requested instructions contain the following paragraph: "Before you members of this jury can convict the defendant of any degree of the crime charged, each of you must be satisfied of his guilt to a moral certainty, and beyond a reasonable doubt. If you are not, then the defendant must be acquitted."

[10] The relevant portion of the charge reads: "If an unreasonable doubt or a mere possibility of innocence were sufficient to prevent a conviction, then practically every criminal would be set free to commit offenses and to prey upon the community and such a rule would be wholly impractical and would break down the forces of law and order and, in fact, would make the lawless supreme." See *Commonwealth* v. *Madeiros*, 255 Mass. 304, 307 (1926).

[11] Appellate counsel was not trial counsel.

object to this portion of the charge.  Although the absence of any objection is relevant, see *Commonwealth* v. *Fluker*, 377 Mass. 123, 131 (1979), we are obliged to review the instructions pursuant to § 33E to determine whether there is a "'substantial likelihood that a miscarriage of justice has occurred.' *Commonwealth* v. *Roberts*, 378 Mass. 116, 123 (1979). *Commonwealth* v. *Burnett*, 371 Mass. 13, 16 (1976)." *Commonwealth* v. *Garcia*, 379 Mass. 422, 439 (1980).[12]

The defendant argues that the *Madeiros* language impermissibly lessens the government's burden of proof by creating in the minds of the jurors the possibility that guilt may be established by a general concern for public safety.  Whatever the merits of that argument in general, it is not convincing in this case.  On at least five occasions, the judge instructed the jury that the Commonwealth had the burden of proving beyond a reasonable doubt every essential element of the crimes.[13]  The judge also defined reasonable doubt in the language of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). We, therefore, conclude that the defendant has not established that the *Madeiros* language created a substantial likelihood of a miscarriage of justice.

Nevertheless, we believe that "[t]he emotional overtones of [the *Madeiros*] rhetoric may be criticized as subtly encouraging a jury to accept less proof than it should, so that 'the lawless' will not be 'supreme,'" *Bumpus* v. *Gunter*, 635 F.2d 907, 911 (1st Cir. 1980), cert. denied, 450 U.S. 1003 (1981), and we repeat that "[e]xplanations of reasonable doubt are best made in close reliance on the time-tested lan-

---

[12] The defendant did not suggest this argument to the judge at the conclusion of the instructions.  Since this case was tried after *Sandstrom* v. *Montana*, 442 U.S. 510 (June 18, 1979), we "bring greater expectations to the judge's charge and . . . expect more of counsel as well in raising an appropriate objection." *Commonwealth* v. *Chasson*, 383 Mass. 183, 189 (1981).

[13] The judge also charged on manslaughter and self-defense and told the jury that the burden was on the Commonwealth to prove that the defendant did not act in self-defense.

guage of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850)." *Commonwealth* v. *Wood*, 380 Mass. 545, 551 (1980), and cases cited.

c. *Presumption of voluntariness.* The defendant asserts that the judge erred when he instructed the jury that there is a presumption that a confession is voluntary.[14] He claims that the judge's failure to instruct the jury that the Commonwealth has the burden of proving that a confession is voluntary is reversible error. Since the defendant did not object to the instructions on voluntariness, we review this claim to determine whether there is a "'substantial likelihood that a miscarriage of justice has occurred.'" *Commonwealth* v. *Garcia*, 379 Mass. 422, 439 (1980). We would only reverse on a showing of grave prejudice. *Commonwealth* v. *Burnett*, 371 Mass. 13, 16 (1976). See *Commonwealth* v. *Coleman*, 366 Mass. 705, 711 (1975).

Our "humane practice" requires that "when statements amounting to a confession are offered in evidence, the question whether they were voluntary is to be decided at a preliminary hearing in the absence of the jury. If he [the judge] is satisfied that they are voluntary, they are admissible; otherwise, they should be excluded. If the judge decides

---

[14] The judge instructed the jury: "We heard evidence by way of a tape and by testimony of police witnesses as to statements made by the accused whereby he made admissions as to certain facts. Well, a confession is a direct acknowledgement of guilt. What he stated was not a confession. What he stated are considered admissions. The difference between a confession and an admission is that a confession is a direct acknowledgement of guilt on the part of the accused, as contradistinguished from an admission which is a statement by the accused, direct or implied, of facts pertinent to the issue and tending, in connection with proof or other facts, to prove his guilt, but of itself insufficient to authorize a conviction. If you should consider any of the facts admissions as to any particular case, you may consider those. If you should consider that they were a confession — I think I just suggested to you that they were not confessions, but if you might have a different view, then you would have to consider whether or not, if it was a confession of any particular offense, they were voluntarily made. There is a presumption that even a confession is voluntary and competent if there is no evidence to the contrary. So admissions are to be considered by the jury for whatever value they may have, as I just pointed out to you."

that they are admissible, he should then instruct the jury not to consider the confession if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant."[15] *Commonwealth* v. *Marshall*, 338 Mass. 460, 461-462 (1959), and cases cited. See *Commonwealth* v. *Chung*, 378 Mass. 451, 456 (1979).

In the past, we have applied this "humane practice" only to confessions and not to admissions.[16] See *Commonwealth* v. *Gleason*, 262 Mass. 185, 189-190 (1928); *Commonwealth* v. *Jokinen*, 257 Mass. 429, 430 (1926); *Commonwealth* v. *Haywood*, 247 Mass. 16, 18 (1923). However, "[w]e have in recent years questioned whether the same safeguards might not be required for inculpatory statements which fall short of a confession." *Commonwealth* v. *Vick*, 381 Mass. 43, 45 (1980). *Commonwealth* v. *Garcia*, 379 Mass. 422, 432 (1980). *Commonwealth* v. *Fournier*, 372 Mass. 346, 348 (1977). See P.J. Liacos, Massachusetts Evidence 322 (5th ed. 1981). We see no reason to distinguish between admissions and confessions and conclude that the "humane practice" applies to all incriminating statements made by the accused.

Extending our "humane practice" to admissions, we determine that the defendant has not shown a substantial likelihood of a miscarriage of justice. A judge has "no duty to ask the jury to pass on voluntariness unless it is made a live issue at trial." *Commonwealth* v. *Alicea*, 376 Mass. 506,

---

[15] "While this so called 'Massachusetts practice' was approved in *Jackson* v. *Denno*, 378 U.S. 368, 378 (1964), the second prong of it — jury reconsideration — is not constitutionally mandated. See *Lego* v. *Twomey*, 404 U.S. 477, 489-490 (1972)." *Commonwealth* v. *Cole*, 380 Mass. 30, 40 (1980). *Commonwealth* v. *Chung*, 378 Mass. 451, 456 (1979).

[16] At common law, a confession was distinguished from an admission. "A confession consisted either of a direct acknowledgement of guilt of the precise crime charged or of all facts necessary to establish guilt of that crime. An admission in a criminal case is a statement by the accused, direct or implied, of facts pertinent to the issue which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to establish the accused's guilt." P.J. Liacos, Massachusetts Evidence 296-297 (5th ed. 1981).

523 (1978). Compare *Commonwealth* v. *Cole*, 380 Mass. 30, 40 (1980), with *Commonwealth* v. *Brady*, 380 Mass. 44, 53-55 (1980). See *Commonwealth* v. *Pratt*, 360 Mass. 708, 714-715 (1972); *Commonwealth* v. *Preece*, 140 Mass. 276, 277 (1885). At trial, the defendant failed to raise the issue of voluntariness, and the defendant requested no instructions on this issue. At no time did the defendant's testimony focus on the involuntariness of his statements. Rather, the defendant claimed that others had had the motive and opportunity to kill the victim. His testimony was substantially the same as the statement that he made to the police in the third interview. See note 7, *supra*. "[I]n these circumstances the judge was not obliged to submit the issue of voluntariness of the defendant's statements to the jury." *Commonwealth* v. *Brady*, 380 Mass. 44, 58 (1980) (Abrams, J., concurring).

Since the judge instructed the jury that there is a presumption that a confession is voluntary, we think it prudent to elaborate further our "humane practice." The presumption that a confession is voluntary merely places on the defendant the burden of going forward at the suppression hearing with evidence of involuntariness, see *Commonwealth* v. *Harris*, 371 Mass. 462, 471 n.3 (1976), and does not apply at trial. Moreover, even at the suppression hearing, this presumption disappears once the defendant has produced some evidence that the statement was involuntary.

Due process requires the Commonwealth to persuade the judge at the suppression hearing that the statement was voluntary before it is admitted in evidence at trial. See *Jackson* v. *Denno*, 378 U.S. 368 (1964); *Commonwealth* v. *Harris* *supra*. "[A] trial judge has a constitutional obligation to conduct a voir dire examination in the absence of the jury where the voluntariness of a confession is in issue and to make an affirmative finding of voluntariness before the jury are allowed to consider it." *Id*. at 469. This judicial determination of voluntariness is necessary because of the "prejudice inhering in the admixture of a determination of voluntariness together with the jury's inescapable consideration of relia-

bility of the confession, and indeed ultimate guilt or inno-
cence." *Clifton* v. *United States*, 371 F.2d 354, 362 (D.C.
Cir. 1966), cert. denied, 386 U.S. 995 (1967) (Leventhal, J.,
concurring). See *Pea* v. *United States*, 397 F.2d 627 (D.C.
Cir. 1967).

Under our "humane practice" the initial screening by the
judge is the "basic determination safeguarding the accused."
*Clifton* v. *United States, supra* (Leventhal, J., concurring).
Thus we conclude that before any statement by a defendant
to law enforcement officers or their agents may be placed
before the jury, the Commonwealth must prove voluntari-
ness beyond a reasonable doubt.[17]   If the judge concludes
that the defendant's statements are voluntary beyond a rea-
sonable doubt, that conclusion "must appear from the rec-
ord with unmistakable clarity." *Sims* v. *Georgia*, 385 U.S.
538, 544 (1967). *Commonwealth* v. *Harris*, 371 Mass. 462,
472 n.4 (1976). *Eisen* v. *Picard*, 452 F.2d 860, 863 (1st Cir.
1971).

Finally, a defendant's statement is usually "the key item
in the proof of guilt, and certainly one of overpowering
weight with the jury." *Clifton* v. *United States*, 371 F.2d
354, 362 (D.C. Cir. 1966) (Leventhal, J., concurring).
Therefore, if voluntariness is a live issue at trial, see *Com-
monwealth* v. *Alicea*, 376 Mass. 506, 523 (1978), the judge
must instruct the jury that the Commonwealth has the bur-
den of proving beyond a reasonable doubt that the state-
ment was voluntary and that the jurors must disregard the
statement unless the Commonwealth has met its burden.[18]

---

[17] Other jurisdictions also require the prosecution to prove beyond a
reasonable doubt that the defendant's statement was voluntary before it is
admitted in evidence. See *State* v. *Ragsdale*, 249 La. 429 (1966), cert.
denied, 385 U.S. 1029 (1967); *Rhone* v. *State*, 254 So. 2d 750 (Miss.
1971); *People* v. *Huntley*, 15 N.Y.2d 72 (1965); *State ex rel. Goodchild* v.
*Burke*, 27 Wis. 2d 244 (1965), cert. denied, 384 U.S. 1017 (1966).

[18] The judge should "refrain from informing the jury as to his decision
on the issue of voluntariness. . . . Advising the jury of the judge's finding
of voluntariness seems to us to serve no purpose.   Indeed, it may tend to
diminish the benefit of independent jury determination required by our
long-established 'humane' rule." *Harris* v. *Commonwealth*, 371 Mass.

See *Bradley* v. *Commonwealth,* 439 S.W.2d 61, 64 (Ky. App. 1969), cert. denied, 397 U.S. 974 (1970).[19]

3. *Jury misconduct.* After the instructions, four jurors were designated alternate jurors, and the remaining twelve began their deliberations. Approximately thirty minutes after the deliberations had begun, one of the alternates asked to speak to the judge.[20] The alternate alleged that a female juror had told the others that the defendant had left school in the tenth grade because he was habitually in trouble and was jailed or arrested. The alternate also alleged that another female juror referred to blacks as "colored," and had called a black witness "Sapphire,"[21] a patently racist term.

---

478, 481 n.3 (1976). See *Commonwealth* v. *Chung,* 378 Mass. 451, 460 n.12 (1979). To the extent that some of our cases are to the contrary, we decline to follow them. See, e.g., *Commonwealth* v. *Bys,* 370 Mass. 350, 364 (1976); *Commonwealth* v. *White,* 353 Mass. 409, 418 (1967), cert. denied, 391 U.S. 968 (1968).

[19] Our decision today does not require the judge to submit to the jury the question of the validity of a waiver of Miranda rights apart from the over-all determination of voluntariness. Compliance with *Miranda* is a prerequisite for admissibility and is a question of law for the judge. See *Coyote* v. *United States,* 380 F.2d 305, 309-310 (10th Cir.), cert. denied, 389 U.S. 992 (1967); *Betts* v. *Board of Educ. of Chicago,* 466 F.2d 629 (7th Cir. 1972). A jury, however, may consider whether the waiver was voluntary in its over-all determination of voluntariness. "[E]vidence bearing on whether warnings were given and rights were validly waived is 'relevant in determining whether a confession is voluntary.'" *Commonwealth* v. *Chung,* 378 Mass. 451, 458-459 n.9 (1979), quoting *Commonwealth* v. *Valcourt,* 333 Mass. 706, 711 (1956).

[20] The alternate juror told the judge that he did not report these incidents at the time they occurred since, if he were in the jury room during deliberations, he would know whether racial prejudice affected the verdict. Because he was not selected as a deliberating juror, he decided to speak to the judge.

[21] Sapphire was an unpleasant black character on the Amos 'n Andy Show, both on radio and on television. She "spent her life in one long shrewish insistence that Kingfish [her husband] get an honest job." J. Harmon, The Great Radio Comedians 78 (1970). This "home life could hardly have represented an *idealization* of Negro family life" (emphasis in original). *Id.* at 84.

In the presence of counsel, the judge interviewed each of the deliberating jurors to determine if they heard the statement that the defendant had to leave school because he was in trouble. Not one of the deliberating jurors heard this remark.[22] The juror who was alleged to have made this comment denied that she made the statement, and no other juror admitted making this statement. After completing this inquiry, the judge found that the defendant had not met his burden of proving that the jury were exposed to extraneous prejudicial information. But even if this statement were made, the judge found that it had no influence on the jury.

In the course of his inquiry, the judge also asked each juror whether a defense witness had been referred to as "Sapphire." Five jurors admitted hearing the term "Sapphire." The judge found that a defense witness had been called "Sapphire," but that this term had been used in a jocular manner without any racial prejudice which would affect the verdict.[23]

The record supports these findings. All five jurors who heard the term "Sapphire," individually said that this term was understood as a joke, and that it did not affect their ability to render an impartial verdict. Further, the term "Sapphire" was used immediately after the jury heard the testimony of the witness who had been called "Sapphire," on the day before closing arguments and the judge's instructions. During deliberations, the jury requested additional instructions regarding the difference between unarmed robbery and larceny from the person. After receiving these instructions, the jury found the defendant guilty of the lesser charge of larceny from the person. Later, the judge denied the defendant's motion for a new trial because he concluded that the jurors had been concerned with legal principles and not racial prejudice.

[22] Two alternate jurors were the only jurors who told the judge that they heard this statement.

[23] After the inquiry, the defendant moved for a mistrial, and the judge denied his motion.

The defendant argues that in spite of the results of the inquiry, the fact that a racial slur had been used by a juror entitles him to a new trial and nothing less will suffice. We disagree. In *Commonwealth* v. *Fidler,* 377 Mass. 192, 200 (1979), we held that "if specific facts not mentioned at trial concerning one of the parties or the matter in litigation are brought to the attention of the deliberating jury by a juror, . . . such misconduct may be proved by juror testimony." Because a "right to use juror evidence necessarily implies a method to gather that evidence," we said that judges may supervise juror interviews to determine if extraneous prejudicial matters had reached the jury.[24]  *Id.* at 201.  In authorizing these inquiries, we gave the judge broad discretion to make "such order as he deems appropriate for the administration of justice."  *Id.* at 203.

Our decision in *Fidler* did "not permit evidence concerning the subjective mental processes of jurors."  *Commonwealth* v. *Fidler,* 377 Mass. 192, 198 (1979).  "[W]here the juror would testify solely to matters resting in his own consciousness," the value of such testimony is outweighed by the need to protect juror privacy.  *Id.*  In drawing a distinction between "overt factors and matters resting in a juror's consciousness," we recognized that "difficult cases" would arise.  *Id.*  The defendant's claim of racial bias is one of these cases.[25]

---

[24] In *Commonwealth* v. *Fidler,* 377 Mass. 192 (1979), we limited postverdict juror interviews.  The questioning of jurors prior to the verdict is no different from a postverdict inquiry and is governed by the same principles, including judicial supervision.

[25] Rule 606 (b) of the Proposed Massachusetts Rules of Evidence provides:  "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded

The Commonwealth has not argued that evidence of racial prejudice relates to the jurors' mental processes and thus is inadmissible under *Fidler*. Assuming, without deciding, that the judge acted properly when he asked each deliberating juror whether he had heard any racist comments, see *State* v. *Levitt*, 36 N.J. 266 (1961); *People* v. *Castaldia*, 51 Cal. 2d 569 (1959), we find no error. The judge interrogated the jurors and concluded that they could fairly and impartially render a verdict. The judge was "in the best position to judge the weight and credibility of the evidence." *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). "There is no reason to give a judge's finding of fact less weight in [this] . . . context than we ordinarily would, i.e., we accept his finding unless clearly erroneous." *Commonwealth* v. *Ciminera*, 11 Mass. App. Ct. 101, 109, aff'd, 384 Mass. 807 (1981). "[A] finding of fact by the trial judge will not be deemed 'clearly erroneous' unless the reviewing court on the entire evidence is left with the firm conviction that a mistake has been committed." *New England Canteen Serv., Inc.* v. *Ashley*, *supra*. Since a review of the entire record has not left us with a firm conviction that a mistake has been committed, the judge's denial of the defendant's motions is affirmed. In

---

from testifying be received for these purposes." "This is the federal rule," and is in accord with the current Massachusetts rule admitting evidence of extraneous information and excluding evidence of mental processes. Advisory Committee's Notes, Proposed Mass. R. Evid. 606 (b). See Fed. R. Evid. 606 (b); *Commonwealth* v. *Fidler*, 377 Mass. 192 (1979). Federal courts have interpreted the Federal rule to bar evidence of personal and racial prejudice. See *United States* v. *Duzac*, 622 F.2d 911, 913 (5th Cir.), cert. denied, 449 U.S. 1012 (1980); *Smith* v. *Brewer*, 444 F. Supp. 482 (S.D. Iowa), aff'd, 577 F.2d 466 (8th Cir.), cert. denied, 439 U.S. 967 (1978). See also 3 J. Weinstein & M. Berger, Evidence par. 606[04] (1981).

Nevertheless, there may be cases in which such evidence may not be excluded without "'violating the plainest principles of justice.' . . . Where, for example, an offer of proof showed that there was a substantial likelihood that a criminal defendant was prejudiced by the influence of racial bias in the jury room, to ignore the evidence might well offend fundamental fairness." *Smith* v. *Brewer*, 444 F.Supp. 482, 490 (S.D. Iowa), quoting *McDonald* v. *Pless*, 238 U.S. 264, 268-269 (1915).

affirming the judge's rulings, we in no way condone or approve the use of racial slurs.

4. *Variance between the bill of particulars and the proof offered at trial.* The defendant claims that he was prejudiced by the variance between the bill of particulars and the proof offered at trial. Although he concedes that he knew that he was on trial for murder, the degree to be determined by the jury, the defendant says that the bill of particulars suggested that the Commonwealth would attempt to prove murder in the first degree only on the basis of deliberate premeditation and felony-murder and not extreme atrocity or cruelty. Thus, he claims that, when the Commonwealth introduced photographs of the victim to establish extreme atrocity or cruelty, he was surprised and unable to present an adequate defense. The defendant made no objection on this ground at trial, and this contention is not properly before us. We review this claim pursuant to G. L. c. 278, § 33E.

In its particulars, the Commonwealth stated that it would prove that the homicide was committed by "assaulting and beating the victim with the intent to rob and kill" by means of his "hands, feet, shoes and clothes." Prior to trial, the defendant was furnished with copies of the autopsy report which indicated that the victim died from multiple severe blunt injuries. Further, the judge granted the defendant's motion to inspect the evidence in the possession of the Commonwealth, and that evidence included the photographs of the victim. Thus, the defendant was put on notice that the Commonwealth might introduce evidence on the issue of extreme atrocity or cruelty. See *Commonwealth* v. *Whitehead,* 379 Mass. 640, 646-647 (1980). We find no merit in the defendant's claim that he was surprised by the proof offered by the Commonwealth at trial.

5. *Relief pursuant to G. L. c. 278, § 33E.* The court has the obligation pursuant to § 33E to consider broadly the whole case on the law and the facts and "[u]pon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, . . . or for any

other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt." G. L. c. 278, § 33E, as amended through St. 1979, c. 346, § 2. "The search under § 33E is a . . . general and . . . obligatory one for a result that may be 'more consonant with justice.'" *Commonwealth* v. *Davis,* 380 Mass. 1, 15 n.20 (1980), quoting *Commonwealth* v. *Seit,* 373 Mass. 83, 94 (1977). See *Commonwealth* v. *Williams,* 364 Mass. 145, 150 (1973). Our power, however, is to be used with restraint. *Commonwealth* v. *MacDonald,* 371 Mass. 600, 604 (1976).

The only basis for the defendant's conviction of murder in the first degree is extreme atrocity or cruelty.[26] The defendant correctly does not claim that the evidence of repeated blows to the victim's body could not sustain the verdict of murder in the first degree. *Commonwealth* v. *Satterfield,* 362 Mass. 78, 82 (1972) (crime committed with such savagery and brutality as to constitute murder committed with extreme atrocity or cruelty). *Commonwealth* v. *McGarty,* 323 Mass. 435, 440 (1948) ("Repeated violent blows have been held to evince such ferocity as would warrant a finding of extreme atrocity or cruelty"). Rather the defendant claims that the Commonwealth's best evidence against him is more consistent with a lesser degree of guilt than murder in the first degree. We agree.

Viewed in the light most favorable to the Commonwealth, the evidence shows that a fight erupted between the victim, the defendant, his cousin Keith, and Bookman. The fight was not a planned encounter, but was a spontaneous reaction to alleged insults by the victim toward the defendant, Keith, and Bookman. Additionally, the Commonwealth's experts indicated that some of the more savage blows were inflicted by the defendant's cousin Keith. See note 4, *supra.*

---

[26] The judge granted the defendant's motion for a required finding of not guilty on so much of the indictment as charged deliberately premeditated malice aforethought. The jury acquitted the defendant of unarmed robbery and thus eliminated the possibility of felony-murder.

Keith was convicted of murder in the second degree by a different jury. Although "mere inconsistency of the verdicts — i.e., that one jury found [this defendant] guilty of murder in the first degree and another found [Keith] guilty of murder in the second degree — is not ordinarily enough to impel us to exercise our powers under § 33E," *Commonwealth* v. *Pisa*, 372 Mass. 590, 597, cert. denied, 434 U.S. 869 (1977), we believe that in this case, "the evidence of murder in the first degree as distinguished from that of murder in the second degree is much less persuasive." [27] *Id.* at 598. See *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 750-751 (1975).

Further, in deciding whether to "shade the verdict," we are entitled to give weight to the defendant's character. See *Commonwealth* v. *Seit*, 373 Mass. 83, 95 (1977); *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 750 (1975). At the time of the killing, the defendant was seventeen, married, and the father of a young child. He had completed the tenth grade, was about to enter the armed forces, and had no prior convictions. In short, the defendant "was not a hoodlum or gangster." *Commonwealth* v. *Seit, supra.*

With all these factors in mind, we order the verdict reduced to murder in the second degree. The order denying the motion for a new trial is affirmed. We remand this case to the Superior Court where the verdict of guilty of murder in the first degree, and the sentence previously imposed, are to be vacated. A verdict of guilty of murder in the second degree is to be entered, and sentence is to be imposed thereon.

*So ordered.*

---

[27] The trial judge indicated some concern over the verdict of murder in the first degree, but opined that only this court could reduce the verdict to a lesser degree of guilt. But see Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979); *Commonwealth* v. *Gaulden*, 383 Mass. 543, 552-557 (1981).