NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1153                                          Appeals Court

COMMONWEALTH  vs.  LARRY HART.

No. 16-P-1153.

Suffolk.     November 7, 2017. - July 16, 2018.

Present:  Green, C.J., Rubin, & Sullivan, JJ.


Motor Vehicle, Receiving stolen motor vehicle, Operation.
     Evidence, Identification.  Identification.  Jury and
     Jurors.  Practice, Criminal, Jury and jurors, Conduct of
     juror.



     Indictments found and returned in the Superior Court
Department on March 10, 2014.

     The cases were tried before Elizabeth M. Fahey, J.


     Timothy St. Lawrence for the defendant.
     Houston Armstrong (Teresa K. Anderson, Assistant District
Attorney, also present) for the Commonwealth.


     RUBIN, J.  In this direct appeal from his convictions of

receiving a stolen motor vehicle, subsequent offense, G. L.

c. 266, § 28(a), and negligent operation of a motor vehicle,

G. L. c. 90, § 24(2)(a), the defendant raises two arguments;

whether (1) the trial judge erred in denying his motion for a

required finding of not guilty because the Commonwealth produced insufficient evidence of identification, and (2) the judge abused her discretion in denying a motion for mistrial due to juror bias.

1.  <u>Sufficiency</u>.  The easier question relates to the sufficiency of the evidence.  The facts adduced at trial were as follows.  On the evening of January 31, 2014, while unloading a dark Buick Enclave sport utility vehicle (SUV) for his employer, witness Shehab Ragab saw a strange man in the driver's seat of the vehicle.  Ragab identified the man as dark-skinned, thin, and wearing a white jacket and a dark-colored winter hat.  He never saw the man's face.  Ragab unsuccessfully attempted to remove the man from the SUV.  The man drove off.  Ragab called the police at 7:04 <u>P</u>.<u>M</u>. and immediately began to canvass the neighborhood looking for the SUV.  He saw the vehicle, attempted to stop it, and was knocked to the ground.  The SUV sped away in the direction of a Stop & Shop grocery store.  Ragab returned to his place of employment to give a statement to the police when he again saw the SUV.  The police pursued it by foot and by car.

Shortly thereafter, witness Roger Marcon was walking in the neighborhood and saw and heard the SUV stop abruptly on the sidewalk on the Stockwell Street side of Frawley Street, near where he was walking.  He continued to walk.  Although he did not see anyone get out of the SUV, he looked back and saw the

defendant, who is African-American, near the SUV carrying grocery bags from Stop & Shop. The lights were on and the driver's side door was open. The defendant was wearing a dark coat and a dark winter hat, and looked disheveled, frightened, and confused. Marcon saw nobody else near the SUV. When the police arrived, Marcon pointed them toward the defendant, who was then arrested.

At the scene, a detective conducted a show-up of the defendant with Ragab and Marcon. Ragab was unable to make a positive identification of the defendant, although he stated that the defendant's hat and skin color matched those of the man who stole the SUV.[1] Marcon, however, did make a positive identification with 100 percent confidence. Defense counsel's theory was that the defendant, who lived in the neighborhood, was simply walking home from the Stop & Shop. However, the Commonwealth elicited testimony at trial that the intersection of Frawley Street and Stockwell Street was not on the defendant's most direct route home from Stop & Shop.

At trial, the Commonwealth introduced in evidence a video recording from the Stop & Shop parking lot. It showed that, at

---

[1] The discrepancy between Ragab's testimony that the man who stole the SUV was wearing a light coat, and Marcon's testimony that the only man near the SUV -- the defendant -- was wearing a dark coat, was never explained. Nor was the fact that Mr. Ragab testified that the man was thin, but the defendant stated at booking that he weighed 220 pounds.

7:00 P.M., an SUV pulled into the parking lot, a person got out of the vehicle, a person then entered it approximately nine minutes later, and the SUV drove off.

Notwithstanding the equivocal identification by Ragab, the testimony of Marcon that, immediately upon hearing a vehicle screech to a halt on Frawley Street, he turned and saw the stolen vehicle with its lights on and door open and the defendant standing next to it holding bags of groceries and appearing disheveled, frightened, and confused, when combined with the facts that no other person was anywhere in the vicinity and that the location was not along the most direct walking route from the Stop & Shop to the defendant's house (in contravention of the defendant's claim that he was walking home from Stop & Shop), suffice to support the element of identification with respect to which the defendant claims there is insufficient evidence. To be sure, the record contains no explanation for the fact that the video recording purporting to show the stolen SUV entering the Stop & Shop parking lot was time stamped several minutes before the robbery occurred, rather than afterward. While such circumstances might call into question the relevance of the videotape, the adequacy of its authentication, or whether its probative value was outweighed by the risk of unfair prejudice from its introduction, there was no objection to its introduction, and the defendant does not claim

it was error.  Questions about the timing of the video recording, however, do not call into question the sufficiency of the evidence.

2.  Juror bias.  The defendant's other argument relates to comments made by a juror at the beginning of the third day of trial.  When the court officer went to say hello to the jurors, none of whom was African-American in the juror room before the commencement of proceedings on that day, juror no. ten said, "Good morning, it's a good day for a hanging."  Although the court officer stated that most jurors said, "I can't believe you said that," juror no. six claimed that he thought some jurors laughed.

The court officer informed the judge, who conferred with counsel.  The judge and defense counsel agreed that, given the sorry history of lynchings of African-Americans in the United States, this comment by a juror who was not African-American had overtones of racial bias.  The prosecutor did not concede that one could infer racial bias from juror no. ten's comment, but understood that this was a valid interpretation, and agreed that a voir dire of all the jurors was proper.  The judge then interviewed juror no. ten and dismissed him.  Subsequent to the voir dire of that juror, the judge apologized to the defendant and said, apparently reflecting her understanding of the racial

overtones of the comment, "I really do believe that most jurors don't believe, or have the beliefs that this juror expressed."

She then conducted a voir dire of each juror, asking them, in substance, whether they heard juror no. ten's comments, how the other jurors reacted,[2] whether juror no. ten's comment affected their ability to be fair and impartial, and whether they were satisfied that they could fairly and impartially decide the case. She also requested that the jurors not discuss the matter with each other. It was during this voir dire that juror no. six stated that he thought some of the other jurors laughed at juror no. ten's comment. The judge concluded that each juror could continue to serve. While defense counsel did not request that the judge conduct further or more detailed inquiry, and thanked the judge for the process she had undertaken, he nonetheless moved for a mistrial, which motion was denied. It is from that ruling and the resulting judgments that he appeals.

"[J]ustice must satisfy the appearance of justice." Commonwealth v. Patry, 48 Mass. App. Ct. 470, 475 (2000), quoting from Levine v. United States, 362 U.S. 610, 616 (1960). Particularly in the context of this case, with a jury with no African-American members but with an African-American defendant,

---

[2] The judge did not ask all jurors how the other jurors reacted.

a comment like juror no. ten's is a very serious matter.  Cf. Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 868-869 (2017) ("[R]acial bias [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice.  This Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns.  An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy. . . .  All forms of improper bias pose challenges to the trial process.  But there is a sound basis to treat racial bias with added precaution.  A constitutional rule that racial bias in the justice system must be addressed -- including, in some instances, after the verdict has been entered -- is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right").

We do not, however, write on a blank slate with respect to the question before us.  Our decision is controlled by the Supreme Judicial Court's decision in Commonwealth v. Tavares, 385 Mass. 140, cert. denied, 457 U.S. 1137 (1982).  There, deliberating jurors were exposed to a racially charged comment by one of their number, and the judge learned of it before the

verdict was returned.  The Supreme Judicial Court held that "the judge interrogat[ing] the jurors and conclud[ing] that they could fairly and impartially render a verdict," id. at 156 -- as the judge did here -- sufficed to address the risk of the other jurors' exposure to what the court described as "extraneous prejudicial information."  Id. at 154.  Thus, under Tavares, no further questioning, for example, including questions to each juror about whether he or she laughed at juror no. ten's comment, and why,[3] nor application of any heightened burden, presumption, or per se rule, to ensure impartiality, was required in this case.

Defendants, the courts, and the community should be left with no doubt about whether jurors harbor racial prejudice.  See Pena-Rodriguez, 137 S. Ct. at 869.  The risk even of the appearance that racial prejudice might have infected the judicial process, notwithstanding the sensitive efforts of the experienced trial judge, requires strong medicine.  Whether Tavares provides adequate guidance to trial judges seeking to assess the potential effects of racial prejudice expressed in the jury room in all circumstances is something that requires

---

[3] Of course, if a juror did laugh, it would not necessarily reflect racial prejudice; it could have been the result of nervousness or politeness, or some jurors might have been unaware of the history that, the judge found, imbued the "joke" with a racial gloss.

fresh, principled, and rigorous reexamination.  Indeed, the
Supreme Judicial Court has recently introduced a more rigorous
procedure judges should follow when they are informed, after the
verdict has been returned, of racially charged statements made
by jurors.  See Commonwealth v. McCowen, 458 Mass. 461, 497
(2010) (when postverdict allegations are raised of racially
charged statements by jurors, the defendant has the "burden of
proving, by a preponderance of the evidence, that the jury were
exposed to [such] statements"; if this burden is satisfied, then
the Commonwealth must prove beyond a reasonable doubt that the
jury's exposure to the statements was not prejudicial to the
defendant).[4]  And other jurisdictions have recognized that
Tavares-type procedures in the preverdict context will not
always suffice to grant the defendant a fair trial.  See, e.g.,
United States v. Heller, 785 F.2d 1524, 1527 (11th Cir. 1986)
(after discovering that anti-Semitic "jokes" had been made and
laughed at in the jury room, a mistrial was required, even

---

[4] Although we believe something like the McCowen standard
would be appropriate when a judge learns of problematic
statements before a verdict is returned, we do not interpret the
Supreme Judicial Court as so holding.  See McCowen, supra at 497
(juror statements reflecting actual bias, of which the judge
learns postverdict, are evaluated under a two-step process
applied to the jury's exposure to extraneous prejudicial
information).  See also Commonwealth v. Kamara, 422 Mass. 614,
615-617 (1996) (different procedures apply to preverdict and
postverdict disclosures when the jury were exposed to extraneous
prejudicial information).

though when the judge asked each juror during a subsequent voir dire whether they could be impartial, the jurors responded in the affirmative, because "anti-Semitic 'humor' is by its very nature an expression of prejudice on the part of the maker," and "[t]hose who made the anti-Semitic 'jokes' at trial and those who reacted to them with 'gales of laughter' displayed the sort of bigotry that clearly denied the defendant Heller the fair and impartial jury that the Constitution mandates"); People v. Jones, 105 Ill. 2d 342, 351, 352 (1985) (after a typewritten racist "joke" was found in the jury room during deliberations, the judge's voir dire, in which the jurors were questioned as to whether they had seen the material and, if so, whether it would affect their deliberations, was insufficient, and a mistrial was required, because, "[w]here black racist material is found in the jury room during the trial of an accused black man, and the material has admittedly been read by three members of an all-white jury, such circumstances are intolerable, and prejudice to defendant will be presumed").  Cf. State v. Johnson, 630 N.W.2d 79, 84 (S.D. 2001) (juror's statement during voir dire that "I got a rope," and the defendant was African-American, created a "presumption of prejudice" that the prosecution did not rebut, and a mistrial was required).  Of course, whatever standard or procedure is employed, the myriad circumstances that may arise in the trial courts may render it difficult to articulate

specific inquiries to be utilized in all cases.  But in light of the length of time that has passed since Tavares and our keen awareness of the potential for racial bias to infect jury deliberations, we believe it would be appropriate for the Supreme Judicial Court to consider furnishing additional guidance to trial judges seeking to assess the potential for juror taint resulting from discriminatory statements made during deliberations.

Nonetheless, unless and until Tavares is modified by the Supreme Judicial Court, we are bound by it, and bound to apply it.  In the present case, the judge dismissed the juror who made the racially insensitive remark and conducted an inquiry into the impartiality of the remaining jurors who heard it, concluding that they were not affected by it.  Under current law as articulated in Tavares, that is what was required, and the scope of the judge's inquiry did not constitute an abuse of her discretion, nor consequently was denial of the motion for a mistrial beyond the scope of that discretion.  The judgments therefore must be affirmed.

So ordered.