Kenton-Walker, Janet, J.
The defendant, Nga Truong (“Nga”), moves the court to suppress any and all statements made by her to law enforcement on December 1,2008, together with all evidence obtained by the Commonwealth as a result of any statements she made. For the following reasons, the defendant’s motion to suppress is ALLOWED.
FINDINGS OF FACT
Based on the evidence presented at the hearing and the reasonable inferences therefrom, the court makes the following findings of fact.[1]
On November 30, 2008 at approximately 11:10 a.m., Sergeant Kevin Pageau (“Pageau”), of the Worcester Police Department, accompanied by two other officers,[2] responded to an apartment located at 3 Henderson Avenue in Worcester, Massachusetts in order to investigate a 911 call of an unconscious and *224 unresponsive one-year-old baby, Khyle Truong (“Khyle”). Khyle had been taken to the hospital, but was believed to have died. Khyle’s mother, Nga, and his grandmother, Van Truong (“Van”) had also gone to the hospital. Pageau had been assigned as the detective in charge of the investigation.
When Pageau arrived at the apartment shortly after 11:00 a.m. he knew Worcester police had initially arrived at about 10:40 a.m. to find an infant (Khyle) not breathing, and that the responding officer had found vomit on the baby’s face and around his mouth when he attempted to perform CPR. Pageau himself observed what he believed to be vomit in the crib where Khyle had been. Once at the scene, Pageau directed officers from the department’s crime scene unit to collect evidence and take photographs. Pageau remained at the apartment for approximately two hours that day. Khyle Truong was officially pronounced dead just after 12:00 p.m. on November 30, 2008.
Edwin Vasquez (“Edwin”), Nga’s boyfriend, was at the apartment when Pageau and the other officers arrived. Edwin had been at the apartment when the 911 call came in regarding Khyle.[3] Pageau had a brief conversation with him at that time. Later that afternoon, at approximately 2:00 p.m., the police brought Edwin to the police department and took his statement.[4]
At 2:30 p.m. on November 30th Pageau met with both Nga and Van and spoke with them together for approximately half an hour. Prior to speaking with them, Pageau had learned from the emergency room doctors that an hour after he had been removed from the apartment Khyle had a temperature of 101; that Khyle’s death did not appear to be a traditional SIDS[5] death; and that there were no signs of injury or significant illness. Neither Nga nor Van was placed in custody and Pageau did not read them their Miranda warnings. The court finds that Pageau did not discuss with Nga or Van that before speaking with him Nga could meet with Van or another interested adult to discuss her rights. Based on the information he received from Nga and Van, Pageau sent officers from the crime scene unit back to the apartment to retrieve additional evidence.[6]
After the interviews with Edwin, Nga & Van, Pageau and Detective John Doherty (“Doherty”) proceeded with their investigation and obtained information from Worcester Police Department records that a year before Khyle’s death Nga had been a run-away and involved with the Department of Social Services (“DSS”).[7] They had also discovered that eight years earlier, when Nga was eight years old, Van had left her in charge of Nga’s three-month-old baby brother, Hein. Nga found Hein unconscious and brought the baby to an adult who lived downstairs. Hein was taken to the hospital and pronounced dead. It was determined that the cause of death was SIDS. A DSS report had been filed and neglect found on the part of Van for leaving Nga in charge of Hein. No criminal charges were brought.
On December 1, 2008 at about 10:30 a.m. Pageau and Doherty returned to the apartment because they wanted to bring Nga, Van and Edwin to the police station for further interviews. When they arrived at the apartment, Van, Nga, Edwin, and Nga’s aunt were there. Pageau testified that he told Edwin, Van and Nga that he wanted to speak with them at the police department.[8] Pageau did not place Nga, Van or Edwin into custody, nor did Pageau advise any of them of their Miranda warnings. The court finds that Pageau was not aware that Nga was sixteen years old[9] when he was at the apartment on the morning of December 1st, nor when he met with Nga and Van the day before on November 30th. Pageau testified that his understanding of a juvenile was anyone under the age of eighteen; however, he also testified that under the law a juvenile, at least with regard to Miranda warnings, is an individual under the age of seventeen. Based on that testimony, the court finds that while Pageau believed Nga was a minor (under eighteen), he treated her as if she was not a juvenile (at least seventeen) when telling her he wanted to bring her to the police department for another interview. There was no evidence that Pageau advised Nga or Van that Nga could consult with Van, some other interested adult, or an attorney, to discuss whether or not she should go the police station to be interviewed.
While Nga and Edwin remained at the apartment, a relative drove Van to the police station to meet with Pageau and Doherty. Van was taken to an interview room.[10] The interview with Van began shortly after 11:00 a.m., but the audio and video recording did not begin until 11:20 a.m. At the beginning of the interview, the detectives advised Van of her Miranda warnings. Van agreed to waive her rights and to speak with the detectives. At no time during the two hours of Van’s interview did either detective indicate that they knew Nga was only sixteen, and when at the beginning of the interview they asked Van how old Nga was, she told them Nga was seventeen.[11] The officers never advised Van of Nga’s Miranda rights, they did not ask her if they could interview Nga, and they did not tell Van they would give Nga an opportunity to consult with her, some other interested adult, or an attorney before they interviewed Nga.
It is evident from the interview with Van that Pageau and Doherty firmly believed that Nga had killed Khyle, and the officers were clearly interrogating Van. Pageau questioned Van about Hein’s death and both detectives had reached the conclusion that Hein had not died from SIDS, but rather at the hands of Nga. They linked Khyle’s and Hein’s death together telling Van that two babies were dead and both times Nga was with those babies. They continually insisted that Van tell them what Nga did to those babies. When Van told them that Hein’s death had been from SIDS, the *225 officers were utterly dismissive of that explanation. They were forcefully direct with Van that the story of Hein’s death was incorrect. The detectives insisted with Van that Hein had died the same way Khyle did—by suffocation from being smothered. They insisted that it could not have been a coincidence that two babies died the same way, and that Nga was with both babies when they died. Pageau told Van that Nga had lied to him the day before, he told Van he was going to bring Nga back in, and sarcastically asked Van “Do you think she’s [meaning Nga] going to just walk out of here?” Pageau also told Van they had medical proof that Khyle had been smothered and that science does not lie. They accused Van of not cooperating with them because she would not tell them how Nga had killed Khyle and Hein. Pageau and Doherty also told Van that Nga needed a lot of help, that she was still a juvenile and that Van needed to help Nga get the help she needed.
The interrogation of Van ended at 1:17 p.m. At the end, Pageau tells Van that he’s bringing in her daughter and boyfriend to speak with them. This was simply a statement of fact and not a request for Van’s permission. Pageau’s testimony that during Van’s interrogation they asked Van for permission to speak with Nga, but that he was not sure if his request was on the actual video (which it was not) or after the video recording was over, is simply not credible.
Given that the detectives believed Nga was seventeen, that the focus of their investigation was entirely on Nga, that they had just spent two hours telling Van that Nga had killed Khyle and Hein, and had demanded that Van tell them what Nga had done to those babies, this court finds that the police purposely brought Nga to the station separately from Van and interviewed her after Van.[12] Based on the above, the detectives never intended that Nga and Van would consult with each other prior to Nga’s interview. This court does not credit any portion of Pageau’s testimony that he asked Van for permission to interview Nga or that he asked Van if she wanted to be present during Nga’s interview.[13]
Either during Van’s interrogation or shortly after its conclusion, Pageau sent an officer to the apartment to bring Nga in.[14] Van was no longer at the station when Nga arrived with the officer. Nga was brought to an interview room in the juvenile division located on the second floor of the police department and left alone in that room.[15] Nga was not in handcuffs. At some point, Doherty and Pageau came into the room. Within the first twenty seconds of the interview, Doherty asks Nga to give her date of birth, which she gave as December 1, 1991. The court finds that from that moment Pageau and Doherty should have been and were on notice that Nga was only sixteen years old. Doherty then advised Nga that he was going to go over her rights and asked her if she was there voluntarily. Nga responded that she was, but confirmed that she had been brought to the station by a police officer. Doherty then read Nga her Miranda warnings. He asked her if she understood them and she responded that she did. She also responded “sure” when Doherty asked her if she wanted to speak with them. Doherty asked Nga to sign the Miranda Warnings & Waiver form, which she did at 1:54 p.m.
Immediately after signing, Doherty asked Nga how old she was. Nga responded that she was seventeen. Doherty then asked Nga if she was going to be eighteen in a couple of days, to which Nga said: “I’m going to turn seventeen.” Doherty responded by saying “Oh, you’re going to turn seventeen in a couple days. Okay.” At this point, Pageau asked Nga “You’re not seventeen yet?” Nga said “No.” Pageau’s response was: “But you have spoken with your mother, and you spoke with me, with your mother present yesterday, right?” Nga said “Yes.” Pageau then asked, “And your mother knows you’re here today?” Nga said “Mm-hmm.” Pageau then said “And that’s okay. And as a matter of fact, she just left; right?” Nga responded, “Yes.”
Based on the dialogue between the police and Nga, the court finds that Pageau and Doherty were now well aware that Nga was only sixteen years old, that Van was not present at the police station at this point, and that Nga had not had an opportunity to consult with Van, another interested adult, or an attorney before having her Miranda warnings read and agreeing to waive her rights. The court also finds that the police never told Nga, prior to waiving her Miranda rights, that she could speak with Van, another interested adult, or an attorney about her rights.
Because Pageau and Doherty had come to believe that Nga had killed Khyle prior to their meeting with either Van or Nga, the ensuing interview with Nga became an interrogation in which Pageau and Doherty conveyed their belief to Nga that she had killed not only Khyle, but also her brother, Hein. Despite having told Nga that she was free to leave initially, once the interrogation became forceful, Nga’s requests to end the interview were not honored.[16]
During more than two hours of interrogation, Pageau and Doherty focused exclusively on Nga’s involvement in the death of Khyle. Throughout their questioning, the police theme was that (1) they were aware she had killed Khyle and Hein, (2) they had medical evidence confirming she had smothered Khyle,[17] (3) they knew her mother placed the responsibility for caring for her younger siblings on her, putting too much pressure on her, (4) that neither Van nor Edwin were involved in Khyle’s death, leaving her as the only possible person, and (5) that if she told them what she did, they would get her the help she needed because she was just a juvenile,[18] but if she refused to admit what she did, they would take her to court and tell the jury that she smothered Khyle.
*226 As the interrogation proceeded the detectives’ tone became increasingly aggressive. They continually refused to accept Nga’s many denials that she did not hurt Khyle or Hein.[19] Each time Nga denied knowing how Khyle died, the police accused her of lying and that she was not cooperating with them. Also, throughout the interview, the police reminded Nga that she was only sixteen and at various points asked her about wanting to meet with her mother, or having already spoken with her mother, or that they could call Van if Nga wanted them to and that it was up to Nga. After almost two hours of accusing Nga of killing Khyle and promising Nga that they would get her the help she needed because she was just a juvenile, and help for her brothers by getting them a better life, Nga admitted that she smothered Khyle with one of the teddy bears in his crib. Nga then asked if she could leave at which point she is then left alone in the interview room for almost twenty minutes. When the police return, Nga asks them “Will me and my brothers get to go to foster care?” Pageau responds by saying “Yes, I think so. We’re going to get DSS involved to do some foster care. Okay. Tiy to help them out.” Pageau then goes on to ask Nga if she had spoken with her mother about coming down to the station. Nga says that she had and that she had spoken with her mother by phone. Pageau then asks Nga, “And it was okay with her and it was okay with you?” Nga said “Yes.” Pageau then states “Okay. And we did ask you a couple times if you wanted to speak with her. You’d rather not speak with her?” And then Pageau stated “So as a matter of fact, we let her go, rather than let you talk with her?” Nga’s responses were inaudible, but she nodded her head up and down. At the end of the interrogation, Nga was placed under arrest.
RULINGS OF LAW
Under Miranda v. Arizona, 384 U.S. 436 (1966), when an individual is taken into custody, police are required to inform that individual of her rights against self-incrimination and to an attorney. In addition, the police must obtain a knowing, intelligent, and voluntary waiver of those rights before any interrogation otherwise any subsequent statement is inadmissible. Id. at 444-45; Commonwealth v. Bryant, 390 Mass. 729, 736 (1984); Commonwealth v. Hass, 373 Mass. 545, 552 (1977). The defendant argues that the statement she gave must be suppressed because it was obtained during a custodial interrogation without her having made a knowing, intelligent and voluntary waiver of her Miranda rights. The defendant further argues that her statement was not made voluntarily. This court must first determine if Nga was subject to a custodial interrogation. If she was, the court must then determine if she made a knowing, intelligent and voluntary waiver of her Miranda rights. Finally, the court must determine if Nga’s statement was voluntary.
1. Was the defendant the subject of a custodial interrogation?
Miranda warnings are only required when an individual, including a juvenile, is subject to custodial interrogation. See Commonwealth v. Morse, 427 Mass. 117, 122-23 (1998); Commonwealth v. A Juvenile, 402 Mass. 275 (1988). The defendant bears the burden of proving custody. Commonwealth v. Larkin, 429 Mass. 426, 432 (1999).
“[C]ustodial interrogation [is] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom in any significant way.” Miranda v. Arizona, 384 U.S. at 444 (1966); see Commonwealth v. Haas, 373 Mass. 545, 551-54 (1977). In determining if a person is deprived of freedom in a significant way, the Supreme Judicial Court has recognized four factors to be considered: “(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that the person is a suspect; (3) the nature of the interrogation, i.e. whether the interview was aggressive or, instead, informal; and (4) whether, at the time the incriminating statement or statements were made, the suspect was free to end the interview by leaving the place of the interrogation or by asking the interrogator to leave, or, alternatively, whether the interview terminated with the defendant’s arrest.” Commonwealth v. Sneed, 440 Mass. 216, 220 (2003); see also Commonwealth v. Ira I, 439 Mass. 805, 814 (2003).
“The test is an objective one: whether a reasonable person in the suspect’s shoes would experience the environment in which the interrogation took place as coercive.” Commonwealth v. Larkin, 429 Mass. at 432. The critical question is “whether, considering all the circumstances, a reasonable person in the defendant’s position would have believed that [she] was in custody.” Commonwealth v. Sneed, 440 Mass. at 220, quoting Commonwealth v. Brum, 438 Mass. 103, 111 (2002).
Taking into consideration the four factors and applying them to the totality of the circumstances in this case, the court finds that the defendant has met her burden of proving that she was in custody. Nga had been transported to the police station by a police officer and brought to an interrogation room, equipped with audio and video recording,[20] where she was questioned by two police officers for over two hours. Here, the officers did not just convey to Nga that she was a suspect, but, as found by this court, they spent most of the two hours telling Nga she had killed Khyle, and that she had also killed Hein eight years earlier. The nature of Nga’s interrogation was not conversational or informal. To the contrary, the questioning was exceedingly formal and particularly aggressive. Finally, when Nga attempted to end the interview she was not free to leave, and at the end she was arrested. There is no question that a reasonable person in Nga’s *227 position would understand that she was not free to leave at the time she made the statement. See Commonwealth v. Morse, 427 Mass. at 127.
2. Did the defendant make a knowing, intelligent and voluntary waiver of her Miranda rights?
Having determined that the defendant sustained her burden of proving she was in custody and Miranda warnings were required, the court must determine: (1) whether the warnings were validly given; (2) whether the defendant made a voluntary and knowing waiver of her Miranda rights; and (3) whether the defendant made statements voluntarily, without being intimidated or coerced. Commonwealth v. Williams, 388 Mass 846, 850-56 (1983); Commonwealth v. A Juvenile, 389 Mass. 128, 129 (1983); Commonwealth v. Tavares, 385 Mass. 140, 145, cert. denied, 457 U.S. 1137 (1982). It is the Commonwealth’s burden to prove beyond a reasonable doubt the voluntariness of both the waiver and the statements. Commonwealth v. Day, 387 Mass. 915, 920-21 (1983).
There is no issue that the warnings given to Nga were valid. Rather, this court must determine whether the Commonwealth has proven beyond a reasonable doubt that Nga made a voluntary and knowing waiver of her Miranda rights. For the Commonwealth to successfully demonstrate a knowing and intelligent waiver by a juvenile who has reached the age of fourteen, such as Nga, there “should ordinarily be a meaningful consultation with the parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent. For a waiver to be valid without such a consultation, the circumstances should demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile.” Commonwealth v. A Juvenile, 389 Mass. at 134. This requirement envisioned that the parent of the juvenile was present, the parent understood the warnings, and the parent had the opportunity to explain the rights to the juvenile so that the juvenile understands the significance of waiving those rights. Id.
While actual consultation between the juvenile and a parent, interested adult, or attorney is not required, there must be a “genuine opportunity” for such a consultation. Commonwealth v. Alfonso A., 438 Mass. 372, 381 (2003), citing Commonwealth v. MacNeill, 399 Mass. 71, 78 (1987). In addition, to be any genuine consultation, the adult who is available must be informed of and understand the juvenile’s constitutional rights. Commonwealth v. Alfonso A., 438 Mass. at 382, citing Commonwealth v. Berry, 410 Mass. 31, 34-35 (1991). Such a requirement suggests the presence of an adult, or, “at the very least, contact between the adult and the police so that the police may inform the adult of those rights.” Commonwealth v. Alfonso A., 438 Mass. at 382. Although the law does not expressly require the adult in question to be physically present in order for there to be that “genuine opportunity” for consultation, in all cases where it was found that the required opportunity occurred, an adult was in fact present. Id. “The ‘genuine opportunity’ for consultation that our cases envision is not merely a theoretical opportunity, that the juvenile may utilize at some future time, but an opportunity that is immediately and evidently available to the juvenile before the juvenile waives his or her rights.” Id.
The police never advised Van of Nga’s Miranda rights. The police never provided Nga with the opportunity to consult with Van or some other interested adult, or an attorney, prior to reading her Miranda warnings, or prior to her verbally agreeing to waive those rights and signing the waiver form. In this case, not only was there no genuine opportunity for Nga to have the requisite consultation before she presumably waived her Miranda rights, the police specifically orchestrated their interrogation so Nga could not meet with Van prior to her interview.
Assuming the police believed Nga was seventeen when they interrogated Van, and continued to believe that when they began questioning Nga, moments after obtaining Nga’s waiver, the police learned that she was only sixteen. Pageau was well aware of the significance of this because he immediately asked Nga “But you have spoken with your mother, and you spoke with me, with your mother present yesterday, right?”[21] The detectives’ concern continued throughout Nga’s interrogation because on multiple occasions they asked her if she had spoken with her mother, that her mother knew she was there, and told her that it was up to her if she wanted to have her mother there. This continued right up to the very end of the interrogation, even after Nga admitted to having smothered Khyle.
At best, the evidence is that Nga spoke with Van over the phone at some point on December 1st prior to her being questioned, but since there is absolutely no evidence that the police ever explained Nga’s rights to Van, the court finds that any such conversation between Van and Nga could not have included a discussion of Nga’s rights and what it would mean to waive those rights.[22] Knowledge by Van that Nga was at the station and was being questioned is not compliance with the requirement that “in order for there to be any genuine consultation, the adult who is available must be informed of and understand the juvenile’s constitutional rights.” Commonwealth v. Alfonso A., supra at 381. Based on all of the circumstances, the Commonwealth has failed to demonstrate that Nga had a genuine opportunity for a meaningful consultation.[23]
Because there was no opportunity for meaningful consultation, the Commonwealth must make the alternative showing of “circumstances [demonstrating] a high degree of intelligence, experience, knowledge or sophistication on the part of [Ngal” in order to prove a valid waiver of her Miranda rights. Commonwealth v. Alfonso A 438 Mass. at 384, quoting Commonwealth *228 v. A Juvenile, 389 Mass. 128, 124 (1983). Prior to her contact with the police on November 30th, there was no evidence that Nga had had any previous involvement with the criminal process. At best, there was some indication that Nga had been involved with DSS, allegedly because she had been a runaway, but that does not demonstrate the type of contact that would suggest that Nga was aware of and understood her Miranda rights. Even extensive contact with police and other authorities by itself does not demonstrate unusual sophistication or knowledge about Miranda rights. See Commonwealth v. Guyton, 405 Mass. 497, 503 (1989). In this case, any contact Nga had with official authorities was minimal and does not show that she was aware of and understood her Miranda rights. Also, there was no evidence that on some other occasion Nga had asserted her rights. Contrast Commonwealth v. Pucillo, 427 Mass. 108, 111 (1998); Commonwealth v. King, 17 Mass.App.Ct. 602, 609-10 (1984).
The Commonwealth’s suggestion that because Nga was just two days from her seventeenth birthday she possessed the requisite intelligence and sophistication to independently waive her rights has no merit. While it may be true that there would not have been a difference in Nga’s intelligence and sophistication from December 1, 2008 to December 3, 2008, Massachusetts law has determined that special care must be taken in assessing voluntariness when an individual is under seventeen. Even though drawing the line at seventeen is subject to the objections always raised against hard and fast rules, the law has determined that a line must be drawn. See Roper v. Simmons, 543 U.S. 551, 574 (2005).
The court did not observe either from the audio and video recording, or during the hearing, that Nga was a particularly sophisticated or intelligent sixteen-year-old. Nor did the recordings show an individual who demonstrated any particular experience in or knowledge of the criminal process. In fact, the court observed a frightened, meek, emotionally compromised teenager who never understood the implications of her statements, as evidenced by her asking the police “Will me and my brothers get to go to foster care?” after she admitted she had smothered Khyle. Even assuming, which this court does not, that Nga’s demeanor during the interrogation demonstrated her intelligence and “experience in the ways of the world,” that is not proof beyond a reasonable doubt that Nga was aware of and understood her Miranda rights, and made a valid waiver. The court does not find that the Commonwealth has sustained its heavy burden of demonstrating that Nga had a high degree of intelligence, experience, knowledge, or sophistication to obviate the requirement that she be given the opportunity to consult with her mother, another interested adult, or an attorney prior to being provided with and waiving her Miranda rights. As a result, the court finds that the Commonwealth has failed to prove beyond a reasonable doubt that Nga gave a valid waiver of her Miranda rights.
3. Was the defendant’s statement voluntary?
Apart from a consideration of the validity of a Miranda waiver, due process requires a separate inquiry into the voluntariness of a statement. Commonwealth v. Magee, 432 Mass. 381, 385 (1996). The court must look at the totality of the circumstances surrounding the making of the statement, “to ensure that the defendant’s confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne [her] will.” Commonwealth v. Mahnke, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). “Relevant factors include, but are not limited to, promises or other inducements, conduct of the defendant, the defendant’s age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.” Commonwealth v. Selby, 420 Mass. 656, 663 (1995), quoting Commonwealth v. Mandile, 397 Mass. 410, 413 (1986). “[A] finding that the defendant was unable to make a knowing, voluntary and intelligent waiver of her Miranda rights is not enough, standing alone, to support the finding that her statements were involuntary.” Commonwealth v. Hilton, 450 Mass. 173, 178 (2007). Again, the Commonwealth bears the burden of proving that the defendant’s statement was voluntary beyond a reasonable doubt. Commonwealth v. Tavares, 385 Mass. 140, 151-52 (1982).
In viewing the totality of the circumstances in this case, the Commonwealth has not sustained its burden of showing beyond a reasonable doubt that Nga’s statement was voluntary. As stated above, the particularly aggressive interrogation conducted by the police given Nga’s age together with her lack of sophistication and experience with the criminal process, coupled with her emotional state are all factors that lead to the conclusion that Nga’s statement was not voluntary. In addition, the police repeatedly confronted Nga with knowingly false statements that they had conclusive medical and scientific evidence proving she had killed Khyle, which included false information regarding the presence of lividity and scientific evidence that Khyle had been smothered. Compounding this was the police insisting that Nga had killed Hein eight years earlier, despite having police reports, DSS records, and an autopsy showing that Hein’s death had been investigated and determined to be a SIDS death.
The use of deception as a tactical device is disapproved, and such tactics cast doubt on whether a defendant’s statement is voluntary. See Commonwealth v. Jackson, 377 Mass. 319, 328 n.8 (1979); Commonwealth v. Nero, 14 Mass.App.Ct. 714, 716 (1982). While the use of false statements is a relevant *229 factor to be considered in voluntariness, it does not compel suppression. Instead, it is to be considered as part of the totality of the circumstances. Commonwealth v. DiGiambattista, 442 Mass. 423, 432-33 (2004). If the use of false information is the only factor pointing toward involuntariness, suppression would not ordinarily follow. Id. at 433. However, where there are additional factors suggesting involuntariness, suppression will be required. Id.
In addition to deception regarding medical evidence, the police continually told Nga that she was just a juvenile and if she would admit what she did she would remain in the juvenile court where she would get help. Statements such as “You tell us what happened. We walk right out here. To special crime, juvenile, get on the phone, talk with a social worker, and try to get you some help.” They told Nga there were women out there (meaning outside the interrogation room) “that work with children like you and people that are abused and have issues at home, they have a lot of resources.” The police also promised not just help for her, but also for Nga’s brothers. The detectives told her “there’s no doubt what happened in there. All everyone’s waiting for today is for you admit to what you did so that we can start the process of getting you some help, getting you into a social program. Getting your brothers out of that house. And getting them in a better home, where there’s a mom that gets up in the morning and takes care of them.”[24]
Equally important, the police made it very clear that if Nga did not admit to what she did, they would proceed with putting the case together, go to court with all the evidence and prove that she smothered Khyle. If it went that route, the police clearly implied to Nga that no help would be available. With notable naivete Nga believed what the officers told her since, after admitting she had smothered Khyle, all she wanted to know was whether she and her brothers would now be able to go to a foster home. By continually promising Nga that because she was a juvenile she would be given help if she admitted the crime, the police minimized the seriousness of the charge she was facing.
Where there have been suggestions of leniency in exchange for a confession, combined with false statements concerning allegedly irrefutable evidence that would be used against a defendant, the defendant’s ability to make a voluntary statement is undermined. See Commonwealth v. DiGiambattista, 442 Mass. at 435; Commonwealth v. Meehan, 377 Mass. 552, 563 (1979). The detectives’ assurances to Nga that, because she was a juvenile, she would receive the help she needed if she simply admitted what she had done to Khyle was more than an implied offer of leniency. In this case, they were extremely close to explicit promises. Even if it was not an explicit promise, the police assurances to Nga were still coercive. Coercion can be applied by way of implied promises just as it is by express promises. See Commonwealth v. DiGiambattista, 442 Mass. at 435-36. Given Nga’s age she was even more susceptible to the influences and pressures applied by the detectives. See Roper v. Simmons, 543 U.S. at 569-71. In this case, the offers of leniency if Nga admitted she smothered Khyle represented a quid pro quo. See id. at 436; Commonwealth v. Magee, 423 Mass. at 387. When, as here, there exists a combination of trickery and implied promises, together with Nga’s young age, lack of experience and sophistication, her emotional state, as well as the aggressive nature of the interrogation, the totality of the circumstances suggests a situation potentially coercive to the point of making an innocent person confess to a crime. See Commonwealth v. Scoggins. 439 Mass. 571, 576 (2003). When such a situation exists, the Commonwealth has failed to meet its burden of establishing beyond a reasonable doubt that Nga’s statement was voluntary and the statement must be suppressed. See Commonwealth v. DiGiambattista, 442 Mass. at 439.
4. Seizure of physical evidence.
After admitting that she smothered Khyle, Nga told the officers that she had used a stuffed animal to smother Khyle with.[25] Nga was asked additional questions about which stuffed animal she used and was shown a photograph taken by police of stuffed animals recovered from Khyle’s crib. There were two teddy bears pictured and she was asked which bear she had used. Nga was not sure. Any evidence obtained by the police with regard to either of the two bears based on statements made by Nga must also be suppressed as a fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471 (1963); Commonwealth v. Perrot, 407 Mass. 539, 546-48 (1990); Commonwealth v. Lahti, 398 Mass. 829, 832-37 (1986), cert. denied, 481 U.S. 1017 (1987); Commonwealth v. DiMarzio, 436 Mass. 1012 (2002) [26]
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion to suppress all statements made by her to law enforcement on December 1,2008, together with any evidence obtained as a fruit of those statements is ALLOWED.

The findings of fact made by the court are those that are relevant to the issues presented by this motion. The evidence presented, and considered by the court, consisted of the testimony of Sergeant Kevin Pageau, a computer screen printout, the audio recordings of the interviews of Nga Truong and Van Truong, the video recordings of those interviews, the Miranda Warnings and Waiver form signed by Nga Truong, and the death certificate. The court was also provided with a transcript of the audio and video recording of the interview with Nga Truong to assist the court in following the audio portion of her interview.

Pageau arrived with Detectives Doherty and Goulet. Detective Goulet was from the juvenile division of the Worcester Police Department.

From the interviews with Van and Nga, the court learned that Edwin lived at the apartment with Nga.

Detective Doherty interviewed Edwin and that interview was not audio or video-recorded. Notably, Pageau testified that the Worcester police do not audio or video-record noncustodial statements.

Sudden Infant Death Syndrome.

The officers retrieved two used diapers that Pageau was told had been Khyle’s.

Now called the Department of Children & Families.

This was Pageau’s initial testimony at the hearing. In response to a question from the court, Pageau altered that testimony by stating that he told Van he wanted to speak with her and her daughter at the police station and asked Van if they would be willing to come down to the station to talk with him. The court does not credit this testimony and finds that Pageau did not speak only with Van and was not seeking Van’s permission to speak with Nga.

It is not in dispute that Nga was sixteen years old on December 1, 2008.

The room was a small room, approximately 8 feet by 10 feet, containing a table and three chairs. Two of the chairs were on one side of the table and the third chair was on the other side, with the chairs facing each other. The video camera faced the single chair. There was one door to the room.

 Given all the information Pageau and Doherty had acquired about Nga prior to the interview with Van, including DSS records and police reports regarding Hein’s death, the court finds it hard to believe they were not aware of Nga’s date of birth (December 3, 1991) which would have told them Nga was only sixteen. Also, at one point in the interview with Van, Pageau tells Van that Nga needs help and that she is “still a juvenile.”

Based on the conduct of the police during their interview of Van, together with the information the police had learned regarding Hein’s death, the court finds that Pageau and Doherty specifically wanted to interview Van first and agreed to meet Van at the station. The court does not credit Pageau’s testimony that he thought Nga had come with Van to the police station and did not realize Nga was not there until after his interview with Van was over, since it was clear during the interview with Van that he knew Nga was not there (having left the interview room at least once during Van’s interview, despite testifying that he had not) and that he sent other officers to the apartment to pick up Nga and Edwin.

This is borne out from the interview with Van in which Pageau tells Van that this time he is not interested in hearing the rehearsed and made-up story Van and Nga told him the day before, and when he told Van that Nga had lied to him the day before. During the interview Pageau told Van that she knew Nga had killed Khyle because Nga had told her that. When Van kept saying she did not know how Khyle died, Pageau kept saying that she did and kept asking her what Nga had told her and what Nga had done to those babies. Given the tact he and Doherty had taken with Van, it is logical to infer that Pageau believed that if Van and Nga met and talked before Nga’s interview that Van would tell Nga what had occurred during her interview, which would have seriously compromised his investigation.

It was somewhat unclear from Pageau’s testimony if he sent the officer to go pick up Nga and Edwin while still interviewing Van or if he sent the officer after Van’s interview was concluded.

From the video recordings, this interview room appears to be the same as the one Van had been in.

For example, when Nga asked if she could come back another time to answer questions, she was told there would be no next time. At another point, when she asked when she could leave, Nga was left alone in the room for about five minutes while Pageau checked with his sergeant and then returned to continue questioning her.

At the hearing Pageau testified that he knew no cause of death had been determined for Khyle and that lividity evident in Khyle’s body at the autopsy may have occurred in the morgue. The death certificate did not contain a cause of death. The court finds that Pageau did not possess medical evidence that Khyle had been smothered when interviewing Nga.

Including getting help for her siblings by getting them out of the house and away from Van.

For example, when Nga told Pageau that Hein’s death had been from SIDS, Pageau responded by saying “No .. . big sister syndrome.”

The court also notes that Pageau’s testimony indicates that he believed the interview with Nga was custodial since he testified that custodial interrogations are ones that are audio and video recorded. While the subjective beliefs of law enforcement is irrelevant in determining if a person being questioned is in custody for the purposes of Miranda, such beliefs can influence the conditions surrounding an interrogation. See Stansbury v. California, 511 U.S. 318, 323-24 (1994); Commonwealth v. Morse, 427 Mass. at 124.

As stated earlier, Pageau testified that he understood that a juvenile for Miranda purposes was anyone under the age of seventeen.

Nor is it helpful to the Commonwealth’s cause that Pageau interviewed Van and Nga together the day before since again Pageau did not provide either with their Miranda warnings, did not advise Van of Nga’s rights, nor provide Nga with an opportunity to consult with Van, another interested adult, or an attorney prior to being interviewed.

Even if Nga had been given the opportuniiy to consult with Van prior to waiving her rights, given that the police had told Van that Nga killed both Khyle and Hein, it is questionable whether Van would have been sufficiently concerned with Nga’s welfare to provide Nga with appropriate protection. See Commonwealth v. Alfonso A., 438 Mass. at 383, upholding the Appeals Court determination in 53 Mass.App.Ct. 279, 293 (2001). Whether an adult advising a juvenile is an interested adult must be viewed from the perspective of the police conducting the interview. See Commonwealth v. Berry, 410 Mass. at 37. Where it is apparent to the police that the adult may be actually antagonistic toward the juvenile, that adult could not qualify as someone to provide the juvenile with an opportuniiy for consultation as contemplated by the law. See id. at 36-37.

The police kept insisting that Van was a neglectful mother to not just Nga, but also Nga’s brothers. Pageau and Doherty said how unfair the home situation was to Nga, and that she did not have the chance to just be a regular teenager because of Van. The police version was that Van had put Nga into an untenable and unbearable situation for someone her age by making Nga the one responsible for taking care of not only her own baby, but also her mother’s. As a result, Nga was under tremendous pressure causing her to lose control that resulted in her smothering Khyle.

Nga stated that the stuffed animal was one of the bears in Khyle’s crib.

There was no evidence presented at the hearing as to what specific evidence was obtained or if any such seizure can be admitted as being within an exception to the fruit of the poisonous tree doctrine.