RALPH R., COMMONWEALTH vs., 100 Mass. App. Ct. 150

 
 COMMONWEALTH vs. RALPH R., a juvenile.

100 Mass. App. Ct. 150
 January 21, 2021 - August 23, 2021

Court Below: Juvenile Court, Suffolk County
Present: Green, C.J., Rubin, Sullivan, Kinder, & Singh, JJ. [Note 1]

 

Further appellate review granted, 489 Mass. 1104 (2022).

Firearms. Jury and Jurors. Practice, Criminal, Jury and jurors, Deliberation of jury, Conduct of juror, Required finding. Evidence, Firearm.

This court concluded that, in the face of questions as to the attentiveness of one juror and the possible racial bias of others, a trial judge had an affirmative obligation to conduct a voir dire to ensure that a juvenile's right to a fair trial by an attentive and impartial jury was not compromised; thus, where the trial judge conducted a proper inquiry of one sleeping juror but failed to conduct a similar inquiry into the report of a second sleeping juror, and where the judge failed to make further inquiry into the jury foreperson's report of "discriminating comments" in the jury room, this court vacated the judgment on a youthful offender indictment and the adjudications of delinquency. [154-161] Singh, J., concurring in part and dissenting in part, with whom Kinder, J., joined.

At the trial of a juvenile delinquency complaint and youthful offender indictments, there was sufficient evidence from which the jury could reasonably conclude that the juvenile had possessed a firearm recovered by police from a parking garage, and that the juvenile knew that the firearm contained a large capacity feeding device or that it was loaded. [161-165]

COMPLAINT received and sworn to in the Suffolk County Division of the Juvenile Court Department on June 2, 2014.

 Indictments found and returned in the Suffolk County Division of the Juvenile Court Department on September 8, 2014.

 The cases were tried before Joseph F. Johnston, J.

 Lisa Lana, Committee for Public Counsel Services, for the juvenile.

 Monica J. DeLateur, Assistant District Attorney, for the Commonwealth.

 Page 151 

 SULLIVAN, J. In this case we are asked to decide whether, in the face of questions as to the attentiveness of one juror and the possible racial bias of others, the trial judge had an affirmative obligation to conduct a voir dire to ensure that the juvenile's right to a fair trial by an attentive and impartial jury was compromised. The juvenile contends that the judge erred in his response to reports of sleeping jurors and to a report that jurors were making "discriminating comments" during deliberations. We conclude that the judge conducted a proper inquiry of one of the sleeping jurors but that a similar inquiry into the report of a second sleeping juror should have been conducted. We also conclude that further inquiry into the report of "discriminating comments" in the jury room should have been made. [Note 2] Accordingly, we vacate the judgment and the adjudications of delinquency. 

 The juvenile also challenges the sufficiency of the evidence offered to prove that he possessed a loaded firearm, a large capacity feeding device, and ammunition without a firearm identification (FID) card. [Note 3] We conclude that the evidence was sufficient to support the jury verdicts.

 Discussion. We discuss each of the claims of error below, reciting those facts relevant to each, followed by an analysis of the legal issues presented.

 1. Sleeping jurors. Two jurors were observed sleeping during trial. The background facts are uncontested.

 The evidentiary portion of the trial lasted two days, during which the Commonwealth called five witnesses. On the first day, the judge stopped the direct examination of the first witness after he noticed that the juror in seat number eight (juror 8), who was in the judge's line of sight, appeared to be sleeping for "really a fleeting . . . moment."

 The judge called juror 8 to the bench and explained what he observed in the presence of counsel. The juror acknowledged that her asthma and bronchitis were bothering her and that her eyes were getting heavy. When asked directly if she was sleeping, the 

 Page 152 

juror appeared to answer in the affirmative but indicated that she did not sleep through all the testimony; instead, she reported that her "eyes just went." The following exchange then occurred:

The judge: "I -- this is so important --"

Juror 8: "Um hmm."

The judge: "-- that we have your total, undivided attention and that you sit up and listen carefully to all the evidence."

Juror 8: "Um hmm."

The judge: "If there's a medical issue, a medical reason you need to bring to my attention, --"

Juror 8: "Well, I don't have a hypercola [phonetic] bronchitis. I don't feel good."

The judge: "You don't feel good? Is that going to prevent you from sitting on this jury?"

Juror 8: "I think so. Yeah."

The judge: "I'm sorry. What?"

Juror 8: "Yes."

The judge: "You -- and you didn't -- this didn't come up before?"

Juror 8: "No, it just start[ed] [to] bother me."

 After asking juror 8 to step back, the judge requested counsels' input. The prosecutor indicated that he could "hear [juror 8] sleeping," and that she was a distraction to the rest of the jury. Defense counsel expressed concern that there were two other jurors who might need to be discharged for health reasons. The judge interjected and explained that he was going to continue with the morning session, but that the subject of the sleeping juror would remain a "live, fluid issue."

 At the end of the first day of trial, the judge revisited the issue with counsel. The prosecutor indicated that he had not noticed any issue with juror 8 since the earlier sidebar conference, and defense counsel stated, "That was brief. She was awake the rest of the time." The judge explained that he was satisfied and that he had been watching juror 8 very closely throughout the rest of the day. Based on his observations, the judge expressed his intent to

 Page 153 

 proceed with all fourteen jurors but stated, "If counsel has anything different than that, please let me know." Neither the prosecutor nor defense counsel commented further on the issue.

 Before the jury were brought into the court room the next morning, the judge, a court officer, and counsel discussed unrelated issues involving two other jurors. During that discussion, defense counsel explained that excusing those two jurors would be difficult because "then we have two other jurors sitting there intermittently falling asleep because the gentleman with the white hair at times he'll just be asleep; yesterday, he was snoring." This was the first mention of a second sleeping juror.

 The prosecutor said that he had not noticed the male juror sleeping; however, the judge explained that when the prosecutor presented a video recording (video) during examination of his first witness, the judge had observed the juror in seat number three (juror 3) with his eyes closed and his head down. The judge then asked if all the jurors could see the video, and juror 3 was the only one who did not respond. The judge told counsel,

"And then within seconds of that, though, he was then looking at the screen. So, in my mind, was this someone that was just kind of putting their head down and kind of concentrating and then looking up? So that's what I observed. Now, if you think that's worth inquiry?"

Defense counsel responded, "Yeah, [indiscernible] but I think that happened twice." When the judge indicated that he did not see the second incident and asked for an offer of proof, defense counsel stated, "Same thing that you just described. . . . I don't remember exactly but I do remember you were trying to wake him up . . . I assume that's what you were trying to do." [Note 4] To which the judge responded, "That obvious, huh?" When the court officer then offered to stand near the jury and intervene if she noticed any juror sleeping, the judge asked the court officer to bring any such incidents to his attention. The judge also decided to inform the jury when they could anticipate the close of evidence, because the judge was concerned that there was "snoring . . . at that decibel" the day before. [Note 5]

 Page 154 

 "[A] judicial observation that a juror is asleep, or a judge's receipt of reliable information to that effect, requires prompt judicial intervention." Commonwealth v. Villalobos, 478 Mass. 1007, 1007 (2017), quoting Commonwealth v. McGhee, 470 Mass. 638, 643-644 (2015). If a judge receives a reliable report of a sleeping or inattentive juror, "he or she 'must take further steps to determine the appropriate intervention.'" Villalobos, supra at 1008, quoting McGhee, supra at 644. "Typically, the next step is to conduct a voir dire of the potentially inattentive juror, in an attempt to investigate whether that juror 'remains capable of fulfilling his or her obligation to render a verdict based on all of the evidence.'" Villalobos, supra, quoting McGhee, supra. The burden is on the juvenile to show error. See Villalobos, supra at 1008.

 With respect to juror 8, the juvenile has not met that burden. The judge promptly questioned juror 8 based on his personal observation that the juror appeared to nod off, as well as reports that she was sleeping loudly, and verified that she had not missed any significant portion of the testimony. Following this inquiry, the judge continued to watch juror 8 before deciding what additional action, if any, was necessary. This approach was reasonable. See Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 181 (2009) (break or stretch likely to suffice "[i]f the sleeping is observed at the outset or when the juror is beginning to 'nod off'"). While juror 8 expressed concern about her ability to maintain her attention moving forward, we discern no error in the judge's decision to monitor the situation and seek further input from counsel thereafter. Indeed, after observing juror 8 for the remainder of the day, the judge and counsel were all satisfied with the juror's ability to serve. The judge's response to the observations of juror 8 was a proper exercise of his discretion and was not arbitrary or unreasonable. See Villalobos, 478 Mass. at 1008.

 The judge did not conduct a similar inquiry of juror 3, however, and this was error. The judge received a report, albeit belated, from defense counsel that the white-haired man, juror 3, was asleep and snoring. [Note 6] When asked if further inquiry should be made, defense counsel said, "Yeah, [indiscernible] but I think that happened twice." The judge also saw juror 3 with his head down while a video was playing, and questioned whether he was asleep or merely lowering his head to concentrate, although how the juror 

 Page 155 

could be concentrating on a video while looking down was not explained. The judge was sufficiently concerned as to inquire in a loud voice whether everyone could see the video. Juror 3 did not respond, but seconds later the judge saw him looking at the screen. When asked for an offer of proof, defense counsel said that he saw what the judge saw and went on to remark that the judge had tried to wake up juror 3.

 The report met the threshold test of reliability. The judge made no finding that juror 3 was awake, or that the report was unreliable. Defense counsel told the judge that juror 3 had been asleep on two occasions, and not just asleep, but snoring. The judge also saw juror 3 in apparent slumber and was sufficiently concerned that he made an attempt, initially unsuccessful, to rouse him.

 Moreover, the judge was not well positioned to evaluate defense counsel's observations regarding juror 3 based on his own observations. Mindful of the previous day's incident with juror 8, the judge was also keeping one eye on juror 8 "the whole [time] -- one eye did not leave her." The judge's attention was divided, but more importantly, no one in the court room could have eyes on all jurors at all times; the mere fact that the judge may not have seen the somnolent juror 3 twice, as defense counsel did, does not mean that defense counsel's report was unreliable. See Villalobos, 478 Mass. at 1007-1008; McGhee, 470 Mass. at 644. The judge's own observations were at best ambiguous. As in Villalobos and McGhee, the report met the threshold test of reliability, and the judge's failure to conduct a voir dire of juror 3 was an abuse of discretion that "gave rise to 'serious doubt that the defendant received the fair trial to which he [was] constitutionally entitled.'" 

Villalobos, supra at 1008, quoting McGhee, supra at 645.

 Commonwealth v. Beneche, 458 Mass. 61, 78 (2010), and Commonwealth v. Alleyne, 474 Mass. 771, 777-778 (2016), on which the Commonwealth relies, are inapt. In both of those cases there was little if any suggestion in the record that the juror was asleep. In Beneche, supra, defense counsel reported that a juror might be sleeping or "[m]aybe he's taking notes." The prosecutor confirmed, "It looks like he's sleeping, but he's taking notes." Id. The judge also had observed the juror and determined that the juror was not sleeping. Similarly in Alleyne, supra, "the report was simply that the juror was 'struggling to stay awake,'" not that the juror was asleep. Nor is the situation in this case like the vague and "empty illustration explained by myriad possibilities"

 Page 156 

 described in Commonwealth v. Vaughn, 471 Mass. 398, 412-413 (2015).

 By contrast, here defense counsel told the judge that juror 3 was sleeping, the judge's observations were consistent with the report and did not undermine its reliability, and the judge made no finding that juror 3 was awake. "Indeed, part of the reason a voir dire is necessary in circumstances such as these is that '[u]ncertainty that a juror is asleep is not the equivalent of a finding that the juror is awake.'" Commonwealth v. Gonzalez, 86 Mass. App. Ct. 253, 255-256 (2014), quoting Commonwealth v. Braun, 74 Mass. App. Ct. 904, 905 (2009). This case is more akin to Commonwealth v. Dyous, 79 Mass. App. Ct. 508, 512 (2011), where the prosecutor (and the clerk) reported that a juror was taking "cat naps," but the judge said, "Yeah, I don't know if they were sleeping or keeping their eyes down. Couldn't tell," and declined to inquire of the juror. We noted there that the "colloquy that followed raise[d] a real doubt whether the juror was attentive during the trial." Id. at 513. "[T]he receipt of reliable information from any source, not just the judge's own observation, that a juror is sleeping requires prompt judicial intervention." Villalobos, 478 Mass. at 1008.

 Faced with a reliable report of a second sleeping juror, the judge was obligated to intervene. Defense counsel appears to have requested further inquiry, albeit a day later. [Note 7] Whether juror 3 was asleep, and if so for how long, was a subject that should have been addressed with the juror. As the record presently stands, the only person who could have answered these questions -- juror 3 -- was never asked. Perhaps the judge thought that the amount of time juror 3 may have been asleep was minimal, or that he (the judge) intervened sufficiently at the outset. But "[b]ased on . . . the record . . . we cannot be sure that this is true. The purpose of a voir dire is to investigate the report . . . and to determine what, if anything, the sleeping jurors missed. Because the judge did not conduct a voir dire, we do not have these essential findings." Villalobos, 478 Mass. at 1008-1009. [Note 8]

 Page 157 

 Our dissenting colleagues point out, correctly, that this was a trial beset with juror issues, which the trial judge handled with tact, fairness, and diligence. We agree that the juror issues in this trial would easily test the most patient of trial judges, and further that defense counsel's report of a second sleeping juror came a day late. However, the failure to request a voir dire on the first day is not dispositive; the error is structural. See Gonzalez, 86 Mass. App. Ct. at 255-256; Dyous, 79 Mass. App. Ct. at 512-513. As sympathetic as we may be to a judge (and prosecutor and defense counsel) who are concerned that jurors may be lost midtrial, the issue before us is one of basic and fundamental constitutional protections: the right to a fair and impartial jury. Because the error is structural, vacating the judgment and the adjudications of delinquency is required. Villalobos, 478 Mass. at 1008-1009.

 2. Racial bias. On the second day of deliberations, a Friday, the jury foreperson, at her own request, twice spoke with the judge in the presence of counsel. On the first occasion, after the jury sent a note indicating that they had not reached a unanimous verdict, the foreperson reported to the judge and counsel that she had "some concerns" and explained that the jury could not reach a unanimous verdict "based on individual[s] who are using personal issues, personal matters into this case -- dominating the conversations and just not trying to put -- look at the case with an open mind." The judge properly instructed the foreperson to return to deliberations.

 Later that same day, after the judge excused the jurors for the weekend, the foreperson informed the court officer that she had a question for the judge. Recalling that the foreperson previously raised a concern about serving after Monday, and in light of their earlier exchange, the judge prefaced his remarks to the foreperson by explaining,

"I just first want to say that if you have a question that's personal to you regarding any situation that you might have relative to family or otherwise, I will . . . address that with you right now. What I don't want to do is address anything relative to any deliberations . . . right now."

In reference to returning on Monday, the foreperson explained,

The foreperson: "It just -- my work obligation and I -- I can't be on this jury, on this case. There is a lot of discriminating comments among us."

The judge: "I'm sorry, it's what, please?"

The foreperson: "A lot of discriminating comments among the group and they won't -- they [are] not [going to] reach a decision [indiscernible], doesn't matter. It's not a time problem. It's -- some folks are --"

The judge then interrupted the foreperson, told her to "stop," and directed her remarks away from any inquiry into the statements made in the jury room. [Note 9]

 "It is a fundamental tenet of our system of justice that a conviction cannot stand if the defendant proves that the jury's deliberations were infected by racial or ethnic bias." Commonwealth v. McCalop, 485 Mass. 790, 790 (2020), citing Commonwealth v. Laguer, 410 Mass. 89, 97-98 (1991). [Note 10] The foreperson's report put the judge on notice of possible bias in the jury room. This report was sufficient to require further investigation, that is, to pose a question to the foreperson as to the nature of the "discriminating comments." See McCalop, supra at 790-791. [Note 11]

 It is important to put the foreperson's report in context. The foreperson had expressed a reluctance to serve. The judge was understandably concerned that she was seeking release from jury duty and told her in no uncertain terms not to divulge any information about deliberations. This was appropriate and consistent with our cases barring gratuitous and unnecessary inquiry into the deliberative process. See Commonwealth v. Tavares, 385 Mass. 140, 155, cert. denied, 457 U.S. 1137 (1982). However, once the reference to "discriminating comments" was made, the landscape changed. The judge may have been understandably skeptical of the foreperson's motives, but the fact that the foreperson may have wanted to be excused does not mean that the comments were not made. Instead of asking what statements were made, however, the judge told the foreperson to "stop" and redirected her away from 

 Page 159 

any discussion of what other jurors said.

 "The presence of even one juror who is not impartial violates a defendant's right to trial by an impartial jury." McCalop, 485 Mass. at 798, quoting Commonwealth v. McCowen, 458 Mass. 461, 494 (2010). For this reason, investigation of a report of racial or ethnic bias is required. See McCalop, supra at 799; Tavares, supra at 156. [Note 12] In McCalop, a juror told defense counsel after the verdict was rendered that racist remarks had been made in the jury room, and that she believed that the comments may have caused some of the jurors to change their votes to guilty. McCalop, supra at 793. Counsel promptly informed the judge and requested the jurors' names and addresses so that the defendant could conduct interviews and obtain an affidavit. Id. at 794. The judge denied the request, concluding that the report lacked specificity, and that a preliminary showing had not been made. The Supreme Judicial Court reversed, concluding that "when defense counsel, in good faith, attests that a deliberating juror told counsel after the verdict that racist statements were made by one or more jurors during the course of deliberations, the judge must give the defendant a fair opportunity" to investigate and obtain affidavits "setting forth with some specificity who among the jurors made [the] statements" and, "to the best of his or her memory, the statements that were made." Id. at 799. Similarly, when a good faith preverdict report of racial or ethnic bias in the jury room is made, it is the judge's responsibility 

 Page 160 

to conduct the inquiry into the presence of racial bias and to take appropriate action. Tavares, supra.

 As in McCalop, the defendant here made the required preliminary showing. Contrast Commonwealth v. Watt, 484 Mass. 742, 760-761 (2020). To be sure, the foreperson's initial report was not that of a "patently racist" statement of racial or ethnic bias, see Tavares, 385 Mass. at 153, any more than the report received in McCalop, 485 Mass. at 799, was a clear or detailed statement of racial bias by deliberating jurors. The question before us, however, is whether the judge was told enough to trigger the obligation to make further inquiry, i.e., to conduct a preliminary investigation. Because this was a preverdict report, that responsibility lay solely and exclusively in the hands of the judge. See Tavares, supra at 155.

 Again, context is crucial. It is self-evident that the foreperson's report of "discriminating comments" was not a complaint that jurors were making "discerning" or "judicious" comments or drawing fine distinctions. See Webster's Third New International Dictionary 648 (2002). Here, the words "discriminating comments" likely meant "discriminatory comments." A report of that nature should have triggered further inquiry. See McCalop, 485 Mass. at 799. Moreover, the foreperson had been instructed not to tell the judge anything about the deliberations, an admonition that the foreperson skirted when she tried to tell the judge of her concerns about the other jurors. When the foreperson returned to the subject of the other jurors' comments, the judge redirected her to other topics. The defendant cannot be faulted for failing to provide a more detailed description, as the authority to question the juror lay exclusively in the hands of the judge, who cabined the inquiry even after the report was made.

 "In exercising discretion determining possible juror bias, . . . the 'trial court must be zealous to protect the rights of an accused.'" Commonwealth v. Vann Long, 419 Mass. 798, 803 (1995), quoting Wainwright v. Witt, 469 U.S. 412, 430 (1985). "[D]iscrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" Peña-Rodriguez v. Colorado, 137 S. Ct. 855, 868 (2017), quoting Rose v. Mitchell, 443 U.S. 545, 555 (1979). It is pernicious not only because it deprives a defendant of the right to a fair and impartial jury in violation of rights secured by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, but also because it systematically infects and undermines confidence in our system of justice as a whole. See Peña-Rodriguez,

 Page 161 

 supra; McCalop, 485 Mass. at 799. [Note 13] As the concurring opinion in McCowen explains, it is possible to address such difficult subjects in a sensitive but thorough manner, balancing the right to trial by an impartial jury with a necessary but limited inquiry into racial or ethnic bias in the jury room. McCowen, 458 Mass. at 498-503 (Ireland, J., concurring). See note 12, supra.

 3. Sufficiency. a. Background. For purposes of our analysis of the sufficiency of the evidence, we summarize the evidence in the light most favorable to the Commonwealth. On May 19, 2014, three members of the Boston police department were in a café while on a break from a court appearance. They saw someone outside the café yelling profanities, walking back and forth, and putting his hand under his sweatshirt. When they left the café to speak with him, the officers saw three men. The young man who had been yelling and another man were standing close to each other near the door to the café; a third young man with a ponytail in blue jeans and a light-colored sweatshirt, later identified as the juvenile, was standing approximately ten feet away.

 Two of the officers began to pat frisk the young man who had been yelling. As the third officer approached, the juvenile began to back away and stand in a manner that shielded part of his body. When an officer asked to speak with the juvenile, he ran. All three officers pursued him. During the chase, the officers observed that the juvenile's left arm swung freely back and forth, while his right arm was cupped and close to his body. Two officers testified that these movements were consistent with a person who was attempting to conceal a weapon.

 The officers lost sight of the juvenile after he ran into a parking garage. With the assistance of other members of law enforcement who had responded to a radio call, the three officers spent approximately thirty to forty-five minutes searching the garage for the juvenile and any weapon that may have been discarded. That search was unsuccessful. The three officers then returned to the nearby court house on an unrelated matter before resuming the search of the garage twenty to thirty minutes later. About fifteen minutes later, one of the three officers recovered a firearm from underneath a burgundy sport utility vehicle (SUV). The firearm held eleven rounds of ammunition in a magazine. The SUV was parked on the 

 Page 162 

first level of the garage, the same level where the main entrance and an exit were located.

 About one hour after the foot chase, the police stopped the juvenile approximately 200 feet from the garage. At the time, the juvenile was wearing a T-shirt, not a sweatshirt. The officers pat frisked him and recovered a small amount of marijuana. One of the officers who had engaged in the earlier chase arrived at the scene and learned the juvenile's name and date of birth. The juvenile was issued a civil citation for the marijuana. [Note 14]

 The police then obtained the surveillance video from the garage and the surrounding area for the period of time during and after the foot chase. The video depicted the juvenile running into the garage and turning between two cars. While the juvenile ran through the garage, he appeared to take something out of a pocket on his right side. The juvenile then entered a stairwell marked with an exit sign. The juvenile's flight path passed by the area where the firearm was recovered under the SUV.

 The juvenile next appeared in a video showing the courtyard outside the garage. He was dressed in a T-shirt and carried the sweatshirt in his hand. He stopped near some shrubs and, when the camera panned back, the sweatshirt could be seen in the shrubs as the juvenile walked away. During the search, a State trooper and a dog from the K-9 unit recovered a gray sweatshirt from the courtyard after the dog located it and reacted to "fresh human odor."

 Additional video showed the juvenile dressed in a T-shirt standing with other young men outside a building connected to the garage after the police left. Some of the young men entered the garage and looked around the parked cars before leaving the garage.

 b. Possession. The juvenile contends that that the jury could not reasonably find actual or constructive possession of the firearm, the large capacity feeding device, and ammunition where the officers did not observe a weapon during the chase, the officers did not locate the firearm during their initial search of the garage, the firearm and ammunition were located over an hour after the chase, the firearm would not have fit completely in the pocket of the sweatshirt, and no fingerprints were recovered from the firearm or the magazine.

 Page 163 

 In assessing whether a motion for a required finding of not guilty was properly denied, "we must consider whether, viewing the evidence in the light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the [juvenile], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted). Commonwealth v. Rivera, 425 Mass. 633, 648 (1997). "Circumstantial evidence is sufficient to find someone guilty beyond a reasonable doubt and inferences drawn from such circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.'" Commonwealth v. Grandison, 433 Mass. 135, 141 (2001), quoting Commonwealth v. Lodge, 431 Mass. 461, 465 (2000).

 At trial, the judge instructed the jury on both actual and constructive possession. "Possession implies 'control and power,' . . . or, in the case of 'constructive possession,' knowledge coupled with the ability and intention to exercise dominion and control." Commonwealth v. Gouse, 461 Mass. 787, 795 (2012), quoting Commonwealth v. Brzezinski, 405 Mass. 401, 409 (1989). "Proof of possession and knowledge may be established by circumstantial evidence and the inferences that can be drawn therefrom." Gouse, supra.

 Here, there was sufficient evidence from which the jury could reasonably conclude that the juvenile possessed the firearm that was recovered from the garage. The juvenile fled when approached by the police. See Commonwealth v. Vick, 454 Mass. 418, 426 (2009) ("It is well established that flight constitutes classic evidence of consciousness of guilt"). The juvenile ran in a stilted manner that was consistent with a person carrying a weapon. The video depicted the juvenile running into the garage and removing something from his pocket while inside. The police then recovered the firearm in an area within the juvenile's flight path. "'While no recoverable fingerprints were found on the [gun] and no one saw anyone throw the firearm [away] during the chase, a jury reasonably could have inferred' that its location in the defendant's flight path was 'consistent with where it would have landed had it been thrown' by the defendant when running from the police through the [garage]." Commonwealth v. Dyette, 87 Mass. App. Ct. 548, 553 (2015), quoting Commonwealth v. Jefferson, 461 Mass. 821, 826 (2012). The evidence of actual possession of the firearm was sufficient. See Commonwealth v. Grayson, 96 Mass. App. Ct. 748, 751 (2019) (evidence of firearm possession sufficient where "defendant fled the police, clutching 

 Page 164 

an item in his waistband, an action that [a police detective] testified was characteristic of persons carrying firearms" and police found firearm next to fence along defendant's apparent path of flight).

 c. Knowledge. The juvenile maintains that even if the evidence of possession was sufficient, his delinquency adjudications cannot stand because no rational juror could infer that the juvenile knew that the firearm contained a large capacity feeding device or that it was loaded. Although the juvenile first raised this issue in his reply brief, we called for supplemental briefing. See Commonwealth v. Cullity, 470 Mass. 1022, 1022 n.2 (2015).

 In order to sustain an adjudication of delinquency under G. L. c. 269, § 10 (n), the Commonwealth was required to prove that the juvenile knew the firearm was loaded. See Commonwealth v. Brown, 479 Mass. 600, 601 (2018). Likewise, to sustain an adjudication of delinquency under G. L. c. 269, § 10 (m), the Commonwealth was required to prove that the juvenile either knew the feeding device he possessed qualified as having a large capacity under the statute or knew the feeding device was capable of holding more than ten rounds of ammunition. See Commonwealth v. Cassidy, 479 Mass. 527, 536, cert. denied, 139 S. Ct. 276 (2018). Such knowledge can be inferred from circumstantial evidence. See Commonwealth v. Ashford, 486 Mass. 450, 454 (2020); Cassidy, supra at 537.

 Here, the high capacity feeding device, loaded with eleven rounds of ammunition, was discovered inside the firearm. The jury were permitted to draw a "commonsense inference" that the juvenile checked to see if the firearm was loaded before putting it in his sweatshirt. Commonwealth v. Resende, 94 Mass. App. Ct. 194, 200 (2018) (rational inference that defendant checked if firearm was loaded before placing in waistband). See Commonwealth v. Silvelo, 486 Mass. 13, 18 (2020) (same); Commonwealth v. Cooper, 97 Mass. App. Ct. 772, 774 (2020) (same where gun tucked in armpit area). Moreover, the jury could have found that the firearm was held in a manner so that it was ready for immediate use, given its location in an open, easily accessible pocket. See id. (sufficient evidence of knowledge that firearm was loaded where "gun was neither holstered, nor concealed"). Contrast Grayson, 96 Mass. App. Ct. at 754 (where pistol tied inside sock, "it [is] harder to draw the inference that the defendant inspected it -- i.e., slid open the magazine to check for bullets -- before putting it in his waistband, or that the defendant intended it to be ready for immediate use and thus knew that it was loaded"). This is particularly 

 Page 165 

so where the evidence supported the conclusion that the juvenile was carrying the weapon on the street outside the café where the police saw the juvenile and two other individuals, one of whom was causing a disturbance. See Commonwealth v. Mitchell, 95 Mass. App. Ct. 406, 419 (2019) ("It is reasonable to infer that one who brings a gun to a location knows whether or not it is loaded"). "On all the facts and circumstances here, then, although the inference of knowledge is not inescapable, it is a reasonable one . . . ." Cooper, supra at 774.

 We further note that although the trial judge did not have the benefit of the Supreme Judicial Court's decisions in Brown and Cassidy, he nevertheless anticipated those cases and instructed the jury on the element of knowledge required to convict under G. L. c. 269, § 10 (h) (1), (n), and (m). "The jury are presumed to follow all instructions they are given." Commonwealth v. Silva, 482 Mass. 275, 290 (2019).

 Conclusion. The judgment and the adjudications of delinquency are vacated, and the verdicts are set aside.

So ordered.

 SINGH, J. (concurring in part and dissenting in part, with whom Kinder, J. joins). I agree that the evidence was sufficient to sustain the jury verdicts. I respectfully disagree with the conclusion that vacating the judgment and the adjudications of delinquency is nonetheless required due to the judge's handling of juror issues.

 1. Inattentive juror. [Note Singh-1] The court concludes that the trial judge's failure to conduct a voir dire following defense counsel's report that a juror had been sleeping on the first day of the evidentiary portion of the trial was an abuse of discretion amounting to legal error. Yet, at the conclusion of the first day, the judge specifically addressed juror issues with counsel. The judge relayed his observations of the jury, which he had been monitoring carefully since the issue with juror in seat number eight (juror 8), and then invited counsel to "let [him] know" if they "ha[d] anything different than that," otherwise the trial would proceed with the existing jurors. Both defense counsel and the prosecutor indicated satisfaction. Defense counsel specifically mentioned that the issue with juror 8 was brief and that the juror was awake for the rest of the 

 Page 166 

time. He made no mention of any other juror suspected of sleeping. The juror in seat number three (juror 3) was not referenced at all.

 It is against this backdrop that defense counsel's "report" of sleeping jurors must be viewed. On the morning of the next day of trial, when discussing juror issues that had come to light since the previous day, defense counsel stated that it was going to be "tricky excusing jurors" because "then we have two other jurors sitting there intermittently falling asleep" and that juror 3 "at times he'll just be asleep; yesterday, he was snoring." The sleeping jurors comment was made in passing, not to alert the judge to an issue or to request any relief. Nonetheless, the prosecutor immediately challenged the remark, noting that he had made no such observations with respect to juror 3.

 The judge, who must have been taken aback, given defense counsel's contrary representations the previous day, also challenged the remark by indicating that he had been watching juror 8 very carefully. [Note Singh-2] The judge then set forth his observations of juror 3 and asked defense counsel what he had observed. Defense counsel agreed with the judge's description but thought "that happened twice." When asked for an offer of proof of the other incident, counsel could give no further particulars, stating that he saw the "[s]ame thing that [the judge had] just described."

 The description given by the judge and agreed to by defense counsel did not indicate that juror 3 was sleeping. Rather, the judge observed juror 3 with his eyes closed and his head down. The judge queried whether this was someone who may have been concentrating, rather than sleeping. See Commonwealth v. Braun, 74 Mass. App. Ct. 904, 905 (2009), quoting Commonwealth v. Keaton, 36 Mass. App. Ct. 81, 87 (1994) ("[m]editation may be mistaken for somnolence"). He tested his hypothesis by trying to get the juror's attention, asking all the jurors whether they could see the video screen. "Seconds" after all the other jurors responded to the judge, juror 3 looked up at the screen. The judge apparently concluded, based on his own firsthand observations, that juror 3 had not been sleeping and that no further intervention was necessary. The judge's response to juror 3's suspected inattention was entirely reasonable.

 When a judge observes that a juror may be inattentive, the judge "must take further steps to determine the appropriate 

 Page 167 

intervention," and while "[t]ypically, the next step is to conduct a voir dire of the potentially inattentive juror," a voir dire is not always necessary. Commonwealth v. McGhee, 470 Mass. 638, 644 (2015). See Commonwealth v. Villalobos, 478 Mass. 1007, 1008 n.1 (2017) ("there may be circumstances where a judge received reliable information that a juror is sleeping and properly exercises his or her discretion to intervene without conducting a voir dire"). See also Commonwealth v. Dancy, 75 Mass. App. Ct. 175, 181 (2009) (where sleeping or "nod[ding] off" is noted at outset, it may be that "a break or a stretch will suffice"). "The judge has 'substantial discretion in this area,' and on appeal, '[t]he burden is on the [juvenile] to show that the judge's response to information about a sleeping juror was 'arbitrary or unreasonable.'" Villalobos, supra at 1008, quoting McGhee, supra. That burden has not been met.

 Here, the judge was vigilant about the issue of juror attentiveness, as well as a whole host of other juror issues, throughout the trial. [Note Singh-3] On the alert as to sleeping juror issues due to the sidebar conference regarding juror 8, and within the hour of the earlier incident, the judge noticed juror 3 and thought that there could be an issue as to inattentiveness. The judge took prompt action to intervene by speaking directly to the jurors to get their attention. [Note Singh-4] His firsthand observation led him to conclude that juror 3 had not been sleeping and that no other intervention was necessary. That this was a nonissue was borne out by the fact that the incident was not mentioned at the conclusion of the court day, which encompassed only two hours of trial testimony, where the judge and both counsel addressed juror issues and specifically the issue of juror inattentiveness.

 Defense counsel's belated passing reference to juror 3 "sleeping" and "snoring" cannot be characterized as a "reliable report." First, it was not meant as a report made in order to obtain some 

 Page 168 

sort of relief; rather, it was loose talk to make the point about the risk of losing jurors. Second, it was contradicted by defense counsel's own statements the previous day, indicating no juror issues since the sidebar conference regarding juror 8. Finally, the report itself was conclusory, without detail, and not corroborated by the prosecutor or the judge. See Commonwealth v. Vaughn, 471 Mass. 398, 412 (2015) (judge warranted in rejecting defense counsel's report of sleeping juror where counsel's description was empty, his claim that prosecutor also saw incident was not affirmed by prosecutor, and judge made his own observations). Contrast Commonwealth v. Braun, 74 Mass. App. Ct. at 905 (contemporaneous observations from three separate sources alerted judge to real likelihood that juror was sleeping through trial). Moreover, when the judge requested an offer of proof, defense counsel had nothing more to add to the judge's own observation. The judge was entitled to rely on his own observations to reach the conclusion that defense counsel's report of juror 3 was not sufficiently reliable to warrant further action. See Vaughn, supra at 413. See also Commonwealth v. Fritz, 472 Mass. 341, 353-354 (2015) (no abuse of discretion to not hold voir dire despite defense counsel's suspicion that one juror may have been sleeping where judge found that he had been watching jurors and did not see anyone sleeping).

 This case is distinguishable from those that have been reversed due to sleeping juror issues. In those cases, the error was in failing to exercise discretion because the judge was "under the mistaken impression that he could not intervene unless he personally observed a juror sleeping." Villalobos, 478 Mass. at 1008. See McGhee, 470 Mass. at 645 (judge's reason for taking no further action other than observing juror "was essentially that he had not himself seen the juror sleeping"); Commonwealth v. Dyous, 79 Mass. App. Ct. 508, 513 (2011) (judge explained, "I personally, I didn't observe him actually sleeping. So I'm not going to do anything"). Cf. Braun, 74 Mass. App. Ct. at 904-905 (judge took no action because based on his own observations, he could not be sure that juror had been sleeping).

 To the contrary, the judge here was well aware of his duty. He took prompt action when he personally observed the concerning behavior of juror 3. The judge's informal investigation allayed his concerns. He also invited comment from counsel at the close of the court day and received no complaints. The following day, the judge treated defense counsel's offhand remark regarding sleeping 

 Page 169 

jurors seriously by asking for an offer of proof. When counsel conceded that he had not seen anything different from what the judge had seen, the judge was well within his discretion in determining that no other action was warranted. See Commonwealth v. Bois, 476 Mass. 15, 27-28 (2016) (no error in failing to conduct voir dire or take any other action following two reports of sleeping jurors, where judge conducted hearing with counsel each time and determined that reports were unreliable). Under the circumstances, the judge's failure to conduct a voir dire of juror number three was not "arbitrary or unreasonable" (citation omitted). [Note Singh-5] Villalobos, 478 Mass. at 1008.

 2. Racial bias. The court concludes that the judge's failure to inquire into what the foreperson meant when she indicated that there were "discriminating comments" among the group of deliberating jurors requires reversal. The foreperson's comment must be taken in context to understand the judge's response.

 The judge was faced with a foreperson who had earlier indicated that she could not continue to serve if the case went into Monday of the following week. On the Friday before, having engaged in less than four hours of deliberations, the foreperson indicated that the jury would not be able to return a unanimous verdict. When told that the jury would have to return for continued deliberations on Monday, the foreperson approached the judge.

 When asked what the issue was, the foreperson responded, "Again, we have Monday." She elaborated, "It just -- my work obligation and I -- I can't be on this jury, on this case. There is a lot of discriminating comments among us." Since the foreperson

 Page 170 

 had first mentioned her work obligation as being the issue with returning on Monday, the judge sought to clarify the nature of the conflict. The foreperson responded,

"I can do the jury for this week. I can not -- if it leaks to next week, I can not do it. I -- I can't -- there is a . . . risk of my job if I miss -- I miss my job since Tuesday. I can not afford to miss another day and I can not afford -- I can -- I just can -- commitment and money-wise, I can not afford to go on this jury for more than it should right now. One, for my personal, I can't be here next week and, two, from what I am hearing from this group, we're not gonna reach a decision on Monday."

Under the circumstances, the judge's determination that the foreperson's concern was not "discriminating comments" but rather being relieved from jury duty was supported by the record. That determination should be respected by this court. See Commonwealth v. Tavares, 385 Mass. 140, 156, cert. denied, 457 U.S. 1137 (1982) (judge's finding on juror credibility must be accepted unless clearly erroneous).

 The record reflects a common dilemma faced by trial judges: 

how to address a problem raised by a deliberating juror without invading the jury deliberation process. Indeed, "[i]t is not always clear at the outset whether a juror's problem is of a personal nature. It is no easy task for a judge to 'discuss the juror's concerns generally,' and do so 'without delving into deliberations.'" Commonwealth v. Williams, 486 Mass. 646, 656 (2021), quoting Commonwealth v. Tiscione, 482 Mass. 485, 492 (2019). Presented with the possibility that the foreperson may have had a scheduling conflict, the judge here properly framed his discussion with the foreperson as limited only to issues personal to her. See Williams, supra, quoting Commonwealth v. Connor, 392 Mass. 838, 845 (1984) ("the judge should preliminarily inform [the juror] that he cannot be discharged unless he has a personal problem, unrelated to his relationship to his fellow jurors or his views on the case").

 Although further inquiry into the foreperson's comment may have resolved the issue more definitively, the failure to inquire, in and of itself, should not require that the judgment and the adjudications

 Page 171 

 of delinquency be vacated. [Note Singh-6] The foreperson's reference to "discriminating comments" was general and ambiguous and did not reflect a clear report of racial bias in jury deliberations. Contrast Commonwealth v. McCalop, 485 Mass. 790, 793 (2020) (defense counsel attested that juror reported racist statements were made during deliberations and that juror believed racism caused some jurors to vote in favor of finding defendant guilty; counsel should have been able to pursue motion for new trial); Tavares, 385 Mass. at 153 (juror reported that another juror called witness "patently racist term").

 Moreover, defense counsel did not object or otherwise remark on the judge's characterization of the credibility of the report; nor did he request a voir dire to clarify the nature of the reported comments. Contrast McCalop, 485 Mass. at 791 (when approached by juror, postverdict, indicating racial bias in deliberations, defense counsel promptly requested judicial relief to investigate); Commonwealth v. Hart, 93 Mass. App. Ct. 565, 567 (2018) (judge, defense counsel, and prosecutor agreed that voir dire was proper based on court officer's report of juror making disturbing comment with racial overtones). On this record, I cannot conclude that the failure to conduct a further inquiry, without more, requires that the judgment and the adjudications of delinquency be vacated. [Note Singh-7]

FOOTNOTES
[Note 1] This case was initially heard by a panel comprised of Justices Sullivan, Kinder, and Singh. After circulation of the opinion to the other justices of the Appeals Court, the panel was expanded to include Chief Justice Green and Justice Rubin. See Sciaba Constr. Corp. v. Boston, 35 Mass. App. Ct. 181, 181 n.2 (1993). 

[Note 2] All of the jurors in question were deliberating jurors. Other jurors were selected as alternates. 

[Note 3] The juvenile was found to be a youthful offender by virtue of unlawful possession of a firearm without a license, see G. L. c. 269, § 10 (a), and was adjudicated delinquent by reason of carrying a loaded firearm without a license, see G. L. c. 269, § 10 (n), possession of a large capacity feeding device, see G. L. c. 269, § 10 (m), and possession of ammunition without a firearm identification card, see G. L. c. 269, § 10 (h) (1). 

[Note 4] Based on this discussion, we understand, as do the parties, that juror 3 is the same juror referred to by defense counsel as "the gentleman with the white hair," and that defense counsel's report pertained to him. 

[Note 5] It is unclear whether the reference to a snoring juror was to juror 3 or juror 8. 

[Note 6] Defense counsel said, "[A]t times he'll just be asleep; yesterday he was snoring." 

[Note 7] It appears that counsel did request further inquiry, although much of the transcript is indecipherable. 

[Note 8] It is true that the video could be viewed in the jury room. See post at note 5. This begs the question how long juror 3 was asleep. Had there been an inquiry, we would know if juror 3 had been asleep, when, for how long, and whether the availability of the video would suffice to address what he may have missed. In the absence of inquiry and findings, we have no record. 

[Note 9] Although some of the discussion with the foreperson is indiscernible, the judge said, "[S]top -- could I just stop you for a second?" The judge went on to inquire about the foreperson's previous statements about her work commitments. 

[Note 10] The juvenile is Hispanic. 

[Note 11] Although McCalop, 485 Mass. at 798-799, involved postverdict juror interviews, the court's holding regarding the need to investigate complaints of juror bias is equally applicable to preverdict inquiries. See Commonwealth v. Tavares, 385 Mass. 140, 155 n.24, cert. denied, 457 U.S. 1137 (1982) ("The questioning of jurors prior to the verdict is no different from a postverdict inquiry and is governed by the same principles, including judicial supervision"). 

[Note 12] If a report is made, the judge may ask what statements were made, and if statements denoting racial or ethnic bias were made. The judge should further assess whether the remarks impacted the ability of the jurors (both those who made the remarks and those who heard them) to render a fair and impartial verdict. Tavares, 385 Mass. at 156. "'Where juror testimony is needed to ascertain whether the racist statement was made, a judge may inquire of the jurors whether the statement was made but may not inquire into their subjective thought process, such as their reasons for concluding that the defendant was guilty, the content of their deliberations, or the effect of the statement at issue on their thought process.' . . . If the judge finds that the juror's statements reflected actual bias, then the defendant is 'entitled to a new trial without needing to show that the juror's bias affected the jury's verdict.'" McCalop, 485 Mass. at 799-800, quoting McCowen, 458 Mass. at 494 n.35, 496. Where the statements were made but actual bias is not shown, "'the judge still must determine whether the statements so infected the deliberative process with racially or ethnically charged language or stereotypes that it prejudiced the defendant's right' to an impartial jury." McCalop, supra at 800, quoting McCowen, supra at 496-497. If the defendant meets that burden, "the burden then shifts to the Commonwealth to show beyond a reasonable doubt that the defendant was not prejudiced by the jury's exposure to these statements." McCalop, supra, quoting McCowen, supra at 497. 

[Note 13] See Racial Disparities in the Massachusetts Criminal Justice System, A Report by the Criminal Justice Policy Program (Harvard Law School 2020), https://hls.harvard.edu/content/uploads/2020/11/Massachusetts-Racial-Disparity-Report-FINAL.pdf [https://perma.cc/AE88-5ZFG]. 

[Note 14] The officer did not get a good look at the person he chased and could not identify the juvenile. 

[Note Singh-1] I concur with the court's analysis with respect to juror number eight and so focus the discussion on this issue to juror in seat number three. 

[Note Singh-2] Presumably, juror 8 was one of the two jurors that defense counsel referred to as "intermittently falling asleep," yet defense counsel had affirmatively stated the previous day that juror 8 had no issue after the initial sidebar conference. 

[Note Singh-3] The jury included a person who was thirty-six weeks pregnant with twins, who warned that she might vomit during the course of trial; a person who needed accommodation to pump breast milk throughout the day; a person who became agitated and aggressive due to the accommodation made to the other juror because it deprived her of a place to have lunch; and a juror who was ultimately excused for religious reasons. The record reflects that the judge was attentive to the needs of each of the jurors, asked for counsel's input when any issue arose, and dealt with each issue in a thoughtful and measured manner. 

[Note Singh-4] According to the judge, he noticed juror 3 after the prosecutor "put up" the video recording. The record reflects that the judge interrupted the prosecutor to speak to the jurors only three transcript pages later. 

[Note Singh-5] Where the purpose of voir dire is, in part, "to determine what, if anything, the sleeping juror missed," Villalobos, 478 Mass. at 1009, the report concerning juror 3 pertained to the first day of evidentiary portion of the trial when surveillance video recordings of the garage and the surrounding area was shown. The jury were given ample opportunity to view the video recordings during the trial and, notably, during deliberations. The video recordings and enhanced still photographs from the recordings were admitted in evidence as exhibits. Some of the video recordings were shown on the first day both before and after the lunch recess during the testimony of one detective, and some of the footage was replayed the second day -- after defense counsel's report pertaining to juror 3 -- during the testimony of another police officer. Moreover, the jury were provided with the video recordings on a "thumb drive," a laptop computer, and a television so that they could be reviewed during deliberations. Both defense counsel and the prosecutor also discussed the video recordings in their closing arguments, and the prosecutor "implore[d] [the jury] to just take [their] time, and just go back there, repeat the video; watch whatever video [they] find to be the most helpful." 

[Note Singh-6] On a fuller record, a case of racial bias might be made, but it has not been made here. See Commonwealth v. McCowen, 458 Mass. 461, 494-495 (2010) (setting forth process for postverdict inquiry into racial bias in jury deliberation); Dancy, 75 Mass. App. Ct. at 182 (where record was insufficient to determine sleeping juror issue, court noted wiser course to allow counsel to file motion for new trial). I note that this appeal was stayed for some time for counsel to pursue a motion for a new trial, which was ultimately abandoned. 

[Note Singh-7] The juvenile relies primarily on Peña-Rodriguez v. Colorado, 137 S. Ct. 855, 869 (2017), involving a postverdict report of racial bias, in support of his argument that the judge's response to the foreperson's report was inadequate. Even if that framework were to be applied here, the juvenile's claim would fail because he has not made a preliminary showing that "one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." Id. at 869. See Commonwealth v. Watt, 484 Mass. 742, 760 (2020) ("To demonstrate that a postverdict juror inquiry regarding possible racial bias is warranted, a defendant bears the burden of proving by a preponderance of the evidence that a racially charged statement was made"). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.